570 So.2d 257 (1990)
Tommie Lynn STALL, Petitioner,
v.
STATE of Florida, Respondent.
Todd Edward Long, Petitioner,
v.
State of Florida, Respondent.
Nos. 74020, 74390.
Supreme Court of Florida.
October 11, 1990.
Rehearing Denied December 19, 1990.
James Marion Moorman, Public Defender, and Deborah K. Brueckheimer, Asst. Public Defender, Bartow, for Tommie Lynn Stall.
Bruce L. Randall, Fort Lauderdale, John C. Wilkins, III, Bartow, and John H. Weston, Clyde F. DeWitt and Cathy E. Crosson of Weston & Sarno, Beverly Hills, Cal., for Todd Edward Long.
Robert A. Butterworth, Atty. Gen., and Peggy A. Quince, Asst. Atty. Gen., Tampa, for respondent.
James K. Green, West Palm Beach, amicus curiae for American Civil Liberties Union Foundation.
John K. Aurell and Sandra Bower Ross of Aurell, Radey, Hinkle & Thomas, Tallahassee, and Charles B. Ruttenberg, James P. Mercurio, John T. Mitchell and Jeanne Philbin of Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., amicus curiae for Video Software Dealers Ass'n.
David W. Ogden, Donald B. Verrilli and Bruce J. Ennis of Jenner & Block, Washington, D.C., amici curiae for PHE, Inc. and Ultra Corp.
McDONALD, Justice.
We have for review State v. Long, 544 So.2d 219 (Fla. 2d DCA 1989), which expressly declared constitutional section 847.011, Florida Statutes (1985 & Supp. 1986). We have jurisdiction, article V, section 3(b)(3), Florida Constitution, and approve the district court's decision.
The state charged Stall, Long, and several other persons with violating the Florida Racketeer Influenced and Corrupt Organization (RICO) Act, sections 895.01-.06, Florida Statutes (1985), predicated on fortyeight alleged violations of Florida's obscenity statute, section 847.011, Florida Statutes *258 (1985),[1] and the amended version of the statute that took effect in 1986.[2] The state also charged each defendant individually with one or more counts of violating section 847.011. The violations allegedly occurred through the showing, sale, distribution, and rental of allegedly obscene writings and tapes, and objects allegedly intended for obscene purposes, between September 12, 1985 and March 7, 1987. Acting upon the petitioners' pretrial motion, the trial court dismissed the information and declared section 847.011 unconstitutional. The trial court held that, among other things, the statute violated Florida's privacy amendment, article I, section 23 of the Florida Constitution.[3]State v. Long, 544 So.2d at 220. The second district reversed, concluding "that the protection afforded by the Florida right to privacy provision does not shield the appellees from criminal prosecution." Id. at 222. Assuming that the petitioners have vicarious standing to raise their customers' privacy interest, id. at 221-222, we agree with the district court that their customers' right of privacy does not extend to the petitioners.
If an obscenity statute is constitutional, RICO convictions based on that statute can be upheld. Fort Wayne Books, Inc. v. Indiana, 489 U.S. 46, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989). This Court has consistently found section 847.011 to be constitutional. Johnson v. State, 351 So.2d 10 (Fla. 1977), upheld a conviction for selling obscene magazines and reaffirmed the principles that obscenity is not protected by the first and fourteenth amendments and that it is subject to regulation under the police power of the states. In Sardiello v. State, 394 So.2d 1016 (Fla. 1981), we again upheld the statute where the defendants had been charged with possession of obscene material with intent to sell. Moreover, we addressed the issue presented in the instant case in State v. Kraham, 360 So.2d 393 (Fla. 1978), appeal dismissed, 440 U.S. 941, 99 S.Ct. 1415, 59 L.Ed.2d 630 (1979).
The state charged Kraham with selling obscene motion pictures. The trial court dismissed the charges, relying on Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), which held that the state's power to regulate obscenity "does not extend to mere possession by the individual in the privacy of his own home." Id. at 568, 89 S.Ct. at 1250. From that holding the trial court reasoned: "A regulation that criminally punishes one for providing *259 that citizen with material he has a Constitutional right to possess is illogical and arbitrary." Kraham, 360 So.2d at 394. We reversed based on Johnson.
Stanley protects an individual's private possession of obscene materials, and our research discloses no Florida cases where the state prosecuted individuals merely for possessing obscene materials for their private use.[4] This is not to say, however, that our privacy amendment was meant to protect those persons who deal commercially in obscenity. The United States Supreme Court has never extended Stanley to sellers and distributors of obscene materials. Rather, that Court has consistently held that "deterrence of the sale of obscene materials is a legitimate end of state antiobscenity laws." Fort Wayne Books, 109 S.Ct. at 925.
Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), sets the standards for state regulation of obscene material. First, "the permissible scope of such regulation" is confined "to works which depict or describe sexual conduct." Id. at 24, 93 S.Ct. at 2614-15. Then, the basic guidelines are:
(a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value.
Id. (Citations omitted.)
Subsection 847.001(7), Florida Statutes (Supp. 1986), incorporates these standards:
(7) "Obscene" means the status of material which:
(a) The average person, applying contemporary community standards, would find, taken as a whole, appeals to the prurient interest;
(b) Depicts or describes, in a patently offensive way, sexual conduct as specifically defined herein; and
(c) Taken as a whole, lacks serious literary, artistic, political, or scientific value.
Subsection 847.001(11) defines sexual conduct:
(11) "Sexual conduct" means actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, or sadomasochistic abuse; actual lewd exhibition of the genitals; actual physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person is a female, breast; or any act or conduct which constitutes sexual battery or simulates that sexual battery is being or will be committed.
The 1985 statute contained a similar standard:
For the purpose of this section, the test of whether or not material is obscene is: Whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.
§ 847.011(11), Fla. Stat. (1985). Although the 1986 statute refers only to "obscene" material and then defines that term, the 1985 statute contained the term "obscene, lewd, lascivious, filthy, indecent, sadistic, or masochistic" material. § 847.011(1)(a) (1985). Those words, however, constitute a term of art. As stated by Justice Harlan almost thirty years ago:
The words ... "obscene, lewd, lascivious, indecent, filthy or vile," connote something that is portrayed in a manner so offensive as to make it unacceptable under current community mores. While in common usage the words have different shades of meaning, the statute since its inception has always been taken as aimed at obnoxiously debasing portrayals of sex. Although the statute condemns such material irrespective of the *260 effect it may have upon those into whose hands it falls, the early case of United States v. Bennett, 24 Fed.Cas. p. 1093, No. 14571, put a limiting gloss upon the statutory language: the statute reaches only indecent material which, as now expressed in Roth v. United States, supra, 354 U.S. 476 at 489, 77 S.Ct. [1304] at 1311 [1 L.Ed.2d 1498 (1957)], "taken as a whole appeals to prurient interest."
Manual Enterprises, Inc. v. Day, 370 U.S. 478, 482-84, 82 S.Ct. 1432, 1434-35, 8 L.Ed.2d 639 (1962) (emphasis in original, footnotes omitted). The Court recently recognized the continued validity of Justice Harlan's words in Osborne v. Ohio, ___ U.S. ___, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990). The statutes at issue are sufficiently limited, both by their terms and by common sense, to pass constitutional scrutiny.
Osborne also cautions that Stanley is not to be read too broadly. The United States Supreme Court has never done so and has specifically refused to extend Stanley to the sale and distribution of obscene material. E.g., Osborne; Fort Wayne Books; Miller; Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); Kaplan v. California, 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973); United States v. 12 200-Foot Reels of Super 8mm. Film, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); United States v. Orito, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973). Indeed, that Court has specifically stated "that the protected right to possess obscene material in the privacy of one's home does not give rise to a correlative right to have someone sell or give it to others." 12 200-Foot Reels, 413 U.S. at 128, 93 S.Ct. at 2669.
The petitioners claim, however, that we should construe Florida's privacy amendment to protect sellers and distributors of obscene material because, without such extension, an individual's right to possess such material is meaningless. The privacy amendment states, in part, that each "person has the right to be let alone and free from governmental intrusion into his private life." Art. I, § 23, Fla. Const. We first considered this amendment in Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544 (Fla. 1985), and held that in assessing governmental intrusion into an individual's privacy rights the state must demonstrate "that the challenged regulation serves a compelling state interest and accomplishes its goal through the use of the least intrusive means." Id. at 547. Be that as it may, we need not determine whether the obscenity statute embodies a compelling state interest because the privacy amendment does not apply to vendors of obscene material.
Before the right of privacy attaches "a reasonable expectation of privacy must exist." Winfield, 477 So.2d at 547. Determining "whether an individual has a legitimate expectation of privacy in any given case must be made by considering all the circumstances, especially objective manifestations of that expectation." Shaktman v. State, 553 So.2d 148, 153 (Fla. 1989) (Ehrlich, C.J., concurring, emphasis added). Although one may possess obscene material in one's home, there is no legitimate reasonable expectation of privacy in being able to patronize retail establishments for the purpose of purchasing such material. Also, it does not appear that the defense in the instant case presented private individuals whose right to possess obscene materials at home had been violated by the instant state action.
The state has a legitimate interest "in stemming the tide of commercialized obscenity." Paris Adult Theatre I, 413 U.S. at 57, 93 S.Ct. at 2635. To that end, even though a connection between obscene material and antisocial behavior is not proved, a legislature can determine such a connection exists and act on it to protect "the social interest in order and morality." Roth v. United States, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957) (quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942)). Moreover, even if a legislative enactment "reflects unprovable assumptions about what is good for the people, including imponderable aesthetic assumptions, [that] is not a sufficient reason to find that *261 statute unconstitutional." Paris Adult Theatre I, 413 U.S. at 62, 93 S.Ct. at 2638.[5]
In Paris Adult Theatre I, as in the instant case, the petitioners claimed that "state regulation of access by consenting adults to obscene material violates the constitutionally protected right to privacy enjoyed by petitioners' customers." Id. at 65, 93 S.Ct. at 2639. The Court answered by stating:
Even assuming that petitioners have vicarious standing to assert potential customers' rights, it is unavailing to compare a theater, open to the public for a fee, with the private home of Stanley v. Georgia and the marital bedroom of Griswold v. Connecticut. This Court, has, on numerous occasions, refused to hold that commercial ventures such as a motion-picture house are "private" for the purpose of civil rights litigation and civil rights statutes. .. .
Our prior decisions recognizing a right to privacy guaranteed by the Fourteenth Amendment included "only personal rights that can be deemed `fundamental' or `implicit in the concept of ordered liberty.'" This privacy right encompasses and protects the personal intimacies of the home, the family, marriage, motherhood, procreation, and child rearing. Nothing, however, in this Court's decisions intimates that there is any "fundamental" privacy right "implicit in the concept of ordered liberty" to watch obscene movies in places of public accommodation.
If obscene material unprotected by the First Amendment in itself carried with it a "penumbra" of constitutionally protected privacy, this Court would not have found it necessary to decide Stanley on the narrow basis of the "privacy of the home," which was hardly more than a reaffirmation that "a man's home is his castle." Moreover, we have declined to equate the privacy of the home relied on in Stanley with a "zone" of "privacy" that follows a distributor or a consumer of obscene materials wherever he goes. The idea of a "privacy" right and a place of public accommodation are, in this context, mutually exclusive.
Id. at 65-67, 93 S.Ct. at 2640 (citations omitted). Regulating commerce in obscenity falls within the state's "power to make a morally neutral judgment that public exhibition of obscene material, or commerce in such material, has a tendency to injure the community as a whole." Id. at 69, 93 S.Ct. at 2641.
Practically any law interferes in some manner with someone's right of privacy. The difficulty lies in deciding the proper balance between this right and the legitimate interest of the state. As the representative of the people, the legislature is charged with the responsibility of deciding where to draw the line. Only when that decision clearly transgresses private rights should the courts interfere.
In re T.W., 551 So.2d 1186, 1204 (Fla. 1989) (Grimes, J., concurring in part, dissenting in part).
We are a society of individuals who make a whole community. As quoted by the United States Supreme Court:
"... A man may be entitled to read an obscene book in his room, or expose himself indecently there.... We should protect his privacy. But if he demands a right to obtain the books and pictures he wants in the market, and to foregather in public places  discreet, if you will, but accessible to all  with others who share his tastes, then to grant him his right is to affect the world about the rest of us, and to impinge on other privacies. Even supposing that each of us can, if he wishes, effectively avert the eye and stop *262 the ear (which, in truth, we cannot), what is commonly read and seen and heard and done intrudes upon us all, want it or not."
Paris Adult Theatre I, 413 U.S. at 59, 93 S.Ct. at 2635-36 (quoting 22 The Public Interest 25-26 (Winter 1971), footnote omitted, emphasis added in Paris Adult Theatre I).
The right to possess privately does not equate to the right to sell publicly. In the opinion under review Judge Schoonover correctly stated:
It is clear that Florida's right to privacy is broader than the federal right. However, it is not so broad that a person can take it with him to the store in order to purchase obscene material  even though he has the right to possess such material in the privacy of his home.
Long, 544 So.2d at 223 (citation omitted). The privacy amendment "was not intended to provide an absolute guarantee against all governmental intrusion into the private life of an individual." Florida Board of Bar Examiners re Applicant, 443 So.2d 71, 74 (Fla. 1983).
There is no indication that the drafters of article I, section 23 meant to broaden the right of privacy as it relates to obscene materials or that the validity of section 847.011 is affected by the privacy provision.[6] Indeed, had the public been aware of such an application, we seriously doubt that the amendment would have been adopted.
In all due respect to our sister court in Hawaii, its decision in State v. Kam, 69 Haw. 483, 748 P.2d 372 (1988), erroneously rationalized that, because Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), allowed a vendor of contraceptives to raise purchasers' fourteenth amendment claims, a seller of obscene materials can claim and have the same rights as a private citizen to view such materials. Eisenstadt invalidated a Massachusetts statute controlling the sale of condoms because treating in a dissimilar manner similarly situated married and unmarried persons violated the equal protection clause.[7] Before studying the statute the Court found no valid reason for the statute and rejected the contentions that (1) "the law's `plain purpose is to protect purity, to preserve chastity, to encourage continence and self restraint, to defend the sanctity of the home, and thus to engender in the State and nation a virile and virtuous race of men and women'" id. at 448, 92 S.Ct. at 1035 (quoting Commonwealth v. Allison, 227 Mass. 57, 62, 116 N.E. 265, 266 (1917)), or (2) "to serve the health needs of the community by regulating the distribution of potentially harmful articles," id., because the statute was, in reality, merely an attempt to regulate morals, not a health measure. The Court made it clear, however, that it based its decision on equal protection grounds because the statute put users of contraceptives on unequal grounds. There is no such distinction between adults who may have access to obscene materials. Moreover, private users and commercial sellers are separate and distinct classes and may be treated differently.
Eisenstadt provides a vehicle, as do other cases, to raise the constitutionality of a statute by holding that persons or entities in different positions have the same rights and must be treated the same. It certainly *263 does not sustain the rationale that, because one has a right to view obscene material in one's home, statutes forbidding the sale and commercial distribution of such material are invalid.
The statutes under review are constitutional; the decision under review is approved.
It is so ordered.
SHAW, C.J., and OVERTON, EHRLICH and GRIMES, JJ., concur.
BARKETT, J., dissents with an opinion, in which KOGAN, J., concurs.
KOGAN, J., dissents with an opinion, in which BARKETT, J., concurs.
BARKETT, Justice, dissenting.
As repugnant as I personally may find some "obscene" materials to be, I cannot vote to suspend the application of constitutional principles to achieve a desired result. The constitution requires criminal laws to unambiguously define the elements of a crime. A basic legal problem with the criminalization of obscenity is that it cannot be defined. Justice Stewart's assertion that "I know it when I see it" has become a household phrase. Yet, I daresay many households would differ with him and with each other about what is obscene. Thus, this crime, unlike all other crimes, depends, not on an objective definition obvious to all, but on the subjective definition, first, of those who happen to be enforcing the law at the time, and, second, of the particular jury or judges reviewing the case.[*]
Such a procedure runs counter to every principle of notice and due process in our society. The flaw in upholding laws criminalizing "obscenity" is most clearly exposed in attempting to answer the simple question posed by a student: "Who decides what is obscene?" It would be legally indefensible in any other criminal context to respond that a crime is whatever a handful of people define it to be after the fact.
Finally, once you concede, as you must, that Florida protects an individual's right to be free from unwarranted governmental intrusion, you cannot recede from that view simply because you find the activities people choose to engage in personally distasteful. Speculation and "unprovable" and "imponderable aesthetic assumptions" may justify personal decisions, but, contrary to the majority's position, they do not provide a constitutional basis to regulate the private conduct of others.
In this case, we are once again faced with the collision between legal principles and personal views of morality. I believe that a dispassionate and rational examination of the principles involved compels the conclusion that the statutes in question do not survive constitutional scrutiny. Accordingly, I concur with Justice Kogan's scholarly, complete, and correct legal analysis on this issue.
KOGAN, J., concurs.
KOGAN, Justice, dissenting.
In November 1980 the voters of Florida approved a constitutional amendment that was added to the state's Declaration of Rights. The privacy amendment provides:
Right of Privacy.  Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law.
Art. I, § 23, Fla. Const.[8] Some eleven years before the adoption of this amendment, *264 the United States Supreme Court in Stanley v. Georgia, 394 U.S. 557, 564-65, 89 S.Ct. 1243, 1247-48, 22 L.Ed.2d 542 (1969), limited on other grounds, Osborne v. Ohio, ___ U.S. ___, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990), stated:
For also fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy.
... .
Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home... . [A] state has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds.
We ourselves acknowledged this holding as law in State v. Keaton, 371 So.2d 86, 91 (Fla. 1979).
Thus, at the time the privacy amendment was added to the Constitution, both the federal and Florida courts clearly had recognized a right of individuals to possess allegedly obscene materials in the home.[9] Accordingly, Florida constitutional law effectively has incorporated the privacy rights outlined in Stanley. See Keaton, 371 So.2d at 91-92. As we have noted, a "constitutional amendment must be viewed in light of the historical development of the decisional law extant at the time of its adoption. ..." Jenkins v. State, 385 So.2d 1356, 1357 (Fla. 1980) (emphasis added). Accord In re T.W., 551 So.2d 1186, 1197 (Fla. 1989) (Ehrlich, C.J., specially concurring) (privacy amendment incorporated federal privacy law as it existed in 1980).
I believe the right recognized by this Court in Keaton necessarily must include a right of discreet access to entertainment, writings, and other such material if the state cannot show that those materials are actually harmful to specific persons or that they intrude upon the rights of others.
It now is well established that the privacy rights created by Florida law are far broader than their federal counterparts. Cope, To Be Let Alone: Florida's Proposed Right of Privacy, 6 Fla.St.U.L.Rev. 671, 740 (1978) (detailing history). The state privacy amendment "embraces more privacy interests, and extends more protection to the individual in those interests, than does the federal Constitution." T.W., 551 So.2d at 1192. Accord Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544, 548 (Fla. 1985) (Florida privacy right is "much broader in scope than that of the Federal Constitution"). As a result, the federal case law prior to 1981 is persuasive only in that it identifies a portion of the interests protected by Florida's right of privacy.
This is a conclusion rooted as much in logic as in law. Unlike the situation in Florida, the federal right of privacy is an implied right arising not from any written source, but from the penumbras or "shadows" of the Constitution. Nowhere in the entire text of the federal Constitution does the word "privacy" appear. Roe v. Wade, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973), limited on other grounds, Webster v. Reproductive Health Servs., ___ U.S. ___, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989). In some of its opinions the United States Supreme Court has even suggested that the federal right of privacy may encompass only such concerns as "the personal intimacies of the home, the family, marriage, motherhood, procreation, and child rearing." Paris Adult Theatre I v. Slaton, 413 U.S. 49, 65, 93 S.Ct. 2628, 2639, 37 L.Ed.2d 446 (1973). Elsewhere, the United States Supreme Court has gone to pains to distinguish the limited federal right of privacy from the more comprehensive *265 right that can be provided by state constitutions. In Katz v. United States, 389 U.S. 347, 350-51, 88 S.Ct. 507, 510-11, 19 L.Ed.2d 576 (1967), the Court stated:
[T]he Fourth Amendment cannot be translated into a general constitutional "right to privacy." That Amendment protects individual privacy against certain kinds of governmental intrusion, but its protections go further, and often have nothing to do with privacy at all. Other provisions of the Constitution protect personal privacy from other forms of governmental invasion. But the protection of a person's general right to privacy  his right to be let alone by other people  is, like the protection of his property and of his very life, left largely to the law of the individual States.
(Footnotes omitted) (emphasis added).
In contrast to the limited federal right of privacy, Florida law guarantees exactly the kind of general right of privacy mentioned in Katz. As Judge Gerald B. Cope, Jr.,[10] has noted in his scholarly analysis, the history behind the privacy amendment reveals that it was developed and proposed "in direct response to the United States Supreme Court's challenge ... in Katz," quoted above. Cope, supra, at 740.
The broad scope established in the line of cases exemplified by Winfield and T.W. is only underscored by the choice of language in the privacy amendment itself. Professor Patricia Dore has noted that the members of the 1977-78 Constitution Revision Commission,[11] which drafted the amendment with legal assistance from Dore, deliberately chose the phrase "right to be let alone" as a means of distinguishing Florida's broad privacy right from the limited federal right. Dore, Of Rights Lost and Gained, 6 Fla.St.U.L.Rev. 609, 652-53 n. 268 (1978). This choice was based on the fact that Katz itself expressly had distinguished the state-created general "right to be let alone" from the federal "right of privacy."
The choice of phraseology is significant in one other respect. With it, the framers of the privacy amendment firmly planted their work in the mainstream of a longstanding discourse about the relation of individuals and their governments.

I. History of the "Right to Be Let Alone"
The phrase "right to be let alone" did not itself originate in the Revision Commission proposal, but echoes throughout more than a century of intensive legal scholarship and opinion-writing both in Florida and the nation as a whole. First appearing in Judge Cooley's treatise on The Law of Torts 29 (1st ed. 1880), the concept of a right to be let alone soon thereafter was extensively elaborated in a classic law review article by two noted jurists. Warren & Brandeis, The Right to Privacy, 4 Harv.L.Rev. 193 (1890). It was to this 1890 law review article that the Katz Court cited. Katz, 389 U.S. at 350 n. 6, 88 S.Ct. at 510-11 n. 6.
In the early years of its formulation, the "right to be let alone" generally was conceived as a private-law tort concept  the right to be free from unwanted interference by other individuals. See Warren & Brandeis, supra. Thus, the concept of privacy was first developed to confront the problem we now characterize as the tort of "invasion of privacy." This Court adopted this tort as a part of the common law of Florida in 1944, in the famous case involving an alleged invasion of privacy by Marjorie Kinnan Rawlings' book Cross Creek; and at that time we explicitly said that this tort was meant to protect the "right of *266 privacy." Cason v. Baskin, 155 Fla. 198, 20 So.2d 243 (1944).
However, in the intervening century since the Warren and Brandeis article was written, the concept of a "right to be let alone" has expanded beyond its initial private-law formulation and now has given rise to a separate concept that imposes definite limits on governmental action.[12] The development of this public-law concept of privacy parallels the development in this century of new technologies and governmental techniques that have had grave potential to erode personal privacy.
The formulation of privacy as a public-law concept dates roughly from 1928, at a time when totalitarian governments were rising in Europe and Asia. In that year one of the authors of the 1890 article on The Right to Privacy, Justice Louis Brandeis, first gave the phrase "right to be let alone" what has since become its distinctive public-law cast in one of the most famous and oft-quoted[13] dissents in American legal history:
The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone  the most comprehensive of rights and the right most valued by civilized men.
Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting) (emphasis added). In construing the scope of Florida's "right to be let alone," we previously have looked to this formulation. T.W., 551 So.2d at 1191 (relying upon Olmstead, 277 U.S. at 478, 48 S.Ct. at 572 (Brandeis, J., dissenting)). See Hawkins, Florida Constitutional Law: A Ten-Year Retrospective on the State Bill of Rights, 14 Nova L.Rev. 693, 827 n. 674 (1990) (discussing importance of the Olmstead dissent in Florida law).
As Justice Brandeis' statement suggests, the public-law concept of a "right to be let alone" addresses the same concerns as the private-law tort of invasion of privacy, from which it emerged[14]; but it also has expanded to include other problems uniquely associated with state action and the related erosion of privacy in this century. As Prosser and Keeton have noted,
The "zone of privacy," so to speak, that is now safeguarded by the Constitution when state action is involved has been enlarged in recent years. It embraces not only the interests protected by the common law action [for invasion of privacy,] ... but it also protects to a considerable extent the autonomy of the individual to make certain important decisions of a very personal nature.

W. Prosser & W. Keeton, The Law of Torts § 117, at 866 (5th ed. 1984) (emphasis added).
Other legal scholars analyzing Florida's right to be let alone are in accord. One of the first scholars to study Florida's privacy amendment, Judge Cope, noted in 1978 that
[m]odern conditions demand reexamination of the relationship between the individual and his government. If a free society is to remain free, there must be a *267 physical and psychological zone of liberty for each citizen.
Cope, supra at 771 (emphasis added). Distilling this analysis further, another commentator has suggested that the "right to be let alone" in Florida implies not merely privacy in the sense of physical and personal seclusion; it also implies that there is a certain sphere of personal autonomy that is beyond the scope of any governmental interference whatsoever, whether "secluded" or not. Note, Interpreting Florida's New Constitutional Right of Privacy, 33 U.Fla. L.Rev. 565, 571 (1981).

II. Florida Privacy Case Law
Our own prior case law fully reflects the concern for personal autonomy elaborated by Brandeis and those who have followed him. In Rasmussen v. South Florida Blood Service, Inc., 500 So.2d 533, 535 (Fla. 1987) (quoting Nixon v. Administrator of General Services, 433 U.S. 425, 457-58, 97 S.Ct. 2777, 2797-98, 53 L.Ed.2d 867 (1977)), the Court found that, among other things,
the right to privacy encompasses ... "the interest in independence in making certain kinds of important decisions."
More recently, in Shaktman v. State, 553 So.2d 148, 150-51 (Fla. 1989), we emphasized:
One of [privacy's] ultimate goals is to foster the independence and individualism which is a distinguishing mark of our society and which can thrive only by assuring a zone of privacy into which not even government may intrude without invitation or consent.
... . [T]he parameters of an individual's privacy can be dictated only by that individual. The central concern is the inviolability of one's own thought, person, and personal action. The inviolability of that right assures its preeminence over "majoritarian sentiment" and thus cannot be universally defined by consensus.

(footnote omitted) (emphasis added). Indeed, an individual's expectations of privacy are protected whether or not society recognizes them as reasonable, provided these expectations are not spurious. Id. at 153 (Ehrlich, C.J., concurring specially). These comments echoed Justice Shaw's observation some two weeks earlier that the Florida right of privacy protects "`individual dignity and autonomy.'" T.W., 551 So.2d at 1193 (quoting Thornburgh v. American College of Obstetricians & Gynecologists, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986)).
Similarly, in Public Health Trust v. Wons, 541 So.2d 96 (Fla. 1989), this Court found that privacy involves a
"deeply imbedded belief, rooted in our constitutional traditions, that an individual has a fundamental right to be left alone so that he is free to lead his private life according to his own beliefs free from unreasonable governmental interference."
Wons, 541 So.2d at 98 (quoting with approval Wons v. Public Health Trust, 500 So.2d 679, 686 (Fla. 3d DCA 1987) (emphasis added)). In the same opinion, then-Chief Justice Ehrlich cited the following rationale of our Sister Court in Massachusetts:
"The constitutional right to privacy, as we conceive it, is an expression of the sanctity of individual free choice and self-determination as fundamental constituents of life. The value of life as so perceived is lessened not by a decision to refuse treatment, but by the failure to allow a competent human being the right of choice."
Wons, 541 So.2d at 100 (Ehrlich, C.J., specially concurring) (quoting with approval Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 742-44, 370 N.E.2d 417, 426 (1977)) (emphasis added). Accord Satz v. Perlmutter, 362 So.2d 160 (Fla. 4th DCA 1978), approved, 379 So.2d 359 (Fla. 1980) (right of terminally ill patient to die with dignity).
In the recent case of In re Guardianship of Estelle M. Browning, 568 So.2d 4 (1990), we echoed all the case law quoted above. There, we stated that "privacy has been defined as an individual's `control over or the autonomy of the intimacies of personal identity'." Id. at 10 (quoting Gerety, *268 Redefining Privacy, 12 Harv.C.R.-C.L.L.Rev. 233, 281 (1977)).
So important is the right of privacy that it is protected by the most exacting standard of judicial review. As we stated in Winfield,
[t]he right of privacy is a fundamental right which we believe demands the compelling state interest standard. This test shifts the burden of proof to the state to justify an intrusion on privacy. The burden can be met by demonstrating that the challenged regulation serves a compelling state interest and accomplishes its goal through the use of the least intrusive means.
Winfield, 477 So.2d at 547 (citing Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); In re Estate of Greenberg, 390 So.2d 40 (Fla. 1980)). Indeed, the personal autonomy aspect of privacy is so strong an interest that few governmental infringements of that right have survived judicial scrutiny in this state. T.W., 551 So.2d at 1192 (citing cases).

III. Privacy and Entertainment
I believe the present case strongly implicates the right of privacy outlined above. If the state may prohibit individuals from discreetly inquiring into matters that may interest them, whether characterized as literature, reading material, or entertainment, then the personal autonomy guaranteed by the right of privacy is illusory. Even a cursory review of censorship law discloses not merely the fact that views of obscenity have changed profoundly over time, but that a frequent result of censorship is the suppression of personal, intellectual, artistic, and literary inquiry.
Works now studied as masterpieces of English literature, such as Lord Byron's Don Juan, have been held to be obscene. F. Schauer, The Law of Obscenity 6 (1976) (quoting Craig, Suppressed Books 22 (1963)); A. Gerber, Sex, Pornography, & Justice 74 (1965) (citing Lord Byron v. Dugdale, 1 L.J.Ch. 239 (1823)). Similarly, American courts have ordered suppression of works now regarded as classics, such as Theodore Dreiser's An American Tragedy,[15] D.H. Lawrence's Lady Chatterly's Lover,[16] and Erskine Caldwell's God's Little Acre.[17]
In 1933, the United States government made a serious but unsuccessful effort to suppress James Joyce's Ulysses, now considered to be one of the greatest modern novels. United States v. One Book Called "Ulysses," 5 F. Supp. 182 (S.D.N.Y. 1933), aff'd, 72 F.2d 705 (2d Cir.1934). A similarly unsuccessful effort was directed at William Faulkner's Sanctuary shortly before Faulkner became one of a handful of American writers to win the Nobel Prize for literature. Commonwealth v. Gordon, 66 Pa. D. & C. 101 (Phila. 1949).
The attempts at censorship described in these cases reveal how difficult it is to determine what constitutes obscenity. They show that, too often, the label "obscenity" has been used as little more than a buzz-word by which some partisan group has attempted to impose its views of life, art, or entertainment on others who do not share those views. Censorship, in other words, often has served as a vehicle for restricting individual autonomy. This is a result directly contrary to the spirit of Florida's privacy amendment.
For this reason, I believe that the ability to read, think and inquire as one sees fit is a vital component of the right to be let alone because it is a crucial means by which an individual may exercise a genuine, meaningful autonomy free of governmental intrusion.
This conclusion necessarily flows from our case law. As noted earlier, Florida law is settled that the individual has an interest in independence in making personal decisions, Rasmussen, 500 So.2d at 535, and a *269 right to inviolability of thought, person, and personal action that is preeminent over majoritarian sentiment. Shaktman, 553 So.2d at 150-51. The purpose of this right is to foster "individual dignity and autonomy," T.W., 551 So.2d at 1193, so that a person is "free to lead his private life according to his own beliefs." Wons, 541 So.2d at 98. Florida's right to be let alone protects the "sanctity of individual free choice and self-determination as fundamental constituents of life." Id. at 100 (Ehrlich, C.J., specially concurring) (citing with approval Saikewicz, 370 N.E.2d at 426). It guarantees "an individual's expectation of privacy regardless of whether society recognizes that expectation as reasonable." Shaktman, 553 So.2d at 153 (Ehrlich, C.J., specially concurring).
In sum, Florida's right to be let alone actually consists of a bundle of rights. It creates a zone of privacy protecting not merely seclusion and bodily integrity, but also guaranteeing a right to structure one's life as one sees fit so long as no avoidable harm is done to self or others. The right prohibits the government from intervening in the noninjurious aspects of personal life involving matters such as the actualization of one's own identity, spirituality, home or family life, intellect, personal opinions, and emotions.
I believe that, of necessity, this bundle of rights includes a right to obtain noninjurious reading materials and entertainment for discreet personal use. Without such a right, the self-determination and self-actualization guaranteed by the right to be let alone would be meaningless indeed. Minds forbidden to inquire are no less enslaved than minds whose thoughts are dictated by others. The right to be let alone cannot be exercised if all such material, entertainment, and information are subject to the dictates of a community censor or the strictures of a censorial criminal code. The attempt to impose such restrictions plainly rests on the kind of "majoritarian sentiment" described in Shaktman, 553 So.2d at 150-51.
Indeed, it appears that the state's primary motive in enforcing the 1985 and 1986 statutes is the desire to impose a particular perspective on those who do not necessarily share nor desire to share that perspective, at least within the confines of their private lives, and when no harm has been proven. The language of Florida's obscenity statute emphasizes this point. According to section 847.011(11) (1985), gauging "obscenity" requires the application of "contemporary community standards" to determine whether "the dominant theme of the material taken as a whole appeals to prurient interest" (emphasis added).
In the 1986 version of the statute, "obscenity" is material that "[t]he average person, applying contemporary community standards, would find, taken as a whole, appeals to the prurient interest." § 847.001(7)(a), Fla. Stat. (Supp. 1986) (emphasis added). By definition, "community standards" about the propriety of particular kinds of reading or entertainment constitute "majoritarian sentiment" within the meaning of Shaktman, 553 So.2d at 151.
I can only conclude that the statutory reliance upon "community standards" directly intrudes upon the right of personal autonomy and decision-making protected by Florida's right to be let alone. Under the requirements of this right, a community standard may not dictate whether individuals may discreetly inquire into noninjurious forms of literature, reading, and entertainment. What one thinks, views or reads in private, without harm to self or others, is an integral part of the self-actualization and personal development vital to individual autonomy.
I agree with our Sister Court in Hawaii when it concluded that
[r]eading or viewing pornographic material in the privacy of one's own home in no way affects the general public's rights. Anyone who is offended by pornography need not be subjected to it so long as others confine their taste for it to their homes. We accept the eloquent reasoning in Stanley:

It is now well established that the Constitution protects the right to receive information and ideas. "This freedom ... necessarily protects the right to receive... ." *270 This right to receive information and ideas, regardless of their social worth, is fundamental to our free society.
State v. Kam, 69 Haw. 483, 494, 748 P.2d 372, 379 (1988) (emphasis deleted) (quoting Stanley, 394 U.S. at 564-65, 89 S.Ct. at 1247-48). As the Hawaii Court concluded, "[s]ince a person has the right to view pornographic items at home, there necessarily follows a correlative right to purchase such materials for ... personal use, or the underlying privacy right becomes meaningless." Id. 748 P.2d at 380.

IV. Compelling State Interest
This is not to say, however, that the state may never impose reasonable regulations on access to art, reading, or entertainment materials. Under the privacy analysis now well established in Florida, the state still may restrict such access if it can establish two things: (1) a compelling state interest that is (2) advanced through the least intrusive means available. T.W.; Winfield.
On the first of these elements, the state contended at oral argument that obscene materials are inherently harmful. However, it has advanced no shred of evidence to prove that the specific form of entertainment at issue today has ever or will ever result in actual harm to any specific person or persons.[18] I do not believe that abstract, unproven harm is a sufficient reason to invade the right to be let alone. Rather, the state's interest only becomes compelling when it can point to definite harm to specific individuals that either has occurred, or that with reasonable probability will occur, because of the activity in question.[19]
As noted earlier, the statutory language itself suggests a second state interest: deference to "community standards." While concern for such standards may in fact be a legitimate interest for the state to advance in other areas, I do not believe it fairly can be characterized as "compelling" when privacy rights are at stake. The case law and authorities discussed above plainly show that Florida's right to be let alone embodies a strong belief that questions of art, entertainment, and personal taste not intruding upon the rights of others must be left to the conscience of the individual. In the absence of proof of actual harm to specific persons, I believe the state has failed to establish a compelling interest in invading the privacy of individuals in this context.

V. Least Restrictive Means and Overbreadth
As to the second prong of the Winfield test, the courts must confront two closely related questions: whether the statute at issue here has used the least restrictive means available and, as a corollary, whether it is overbroad.
Even if I assume that petitioners' activities have harmed the rights of others  such as by a public or intrusive display of allegedly obscene materials  I cannot conclude that the application of a criminal RICO statute constitutes the least intrusive means available to remedy this harm. The state just as readily could prevent such harm by way of reasonable time, place and manner restrictions contained in statutes imposing fines or other minor penalties. Similarly, laws or ordinances dealing with *271 zoning or advertising displays also could be used to prevent such public displays.
However, the extreme penalties established by the RICO statute sweep far too broadly into the right of personal inquiry and autonomy created by Florida constitutional law. By application of the RICO statute, the state in effect assumes power to shut down and confiscate establishments discreetly offering noninjurious entertainment or reading material for personal home use. It assumes the power to treat as "racketeers" people who merely have purchased such material on two or more occasions. This hardly constitutes a reasonable time, place or manner restriction under Florida law. See Keaton, 371 So.2d at 92.
Closely related to the question of least intrusive means is that of overbreadth, an issue also raised by the parties. If a statute that impinges upon privacy is overbroad, then by definition it is not the least intrusive means.
Initially, I believe that the interests protected by Florida's privacy amendment are directly analogous to, and in the context of this case overlap, interests protected by the free speech guarantees of the Florida and federal constitutions. Judicial weighing of both privacy and free speech interests requires a compelling state interest test. See Gardner v. Bradenton Herald, Inc., 413 So.2d 10, 11 (Fla.) (citing Smith v. Daily Mail Publishing Co., 443 U.S. 97, 101-02, 99 S.Ct. 2667, 2669-70, 61 L.Ed.2d 399 (1979), cert. denied, 459 U.S. 865, 103 S.Ct. 143, 74 L.Ed.2d 121 (1982). Moreover, the right of free speech itself is explicitly concerned at least with some kinds of privacy interests, particularly in the arena of obscenity law. E.g., Keaton, 371 So.2d at 91 (citing Stanley, 394 U.S. at 564-65, 89 S.Ct. at 1247-48). I thus rely on our own prior case law dealing with the overbreadth doctrine in the context of obscenity law.
In Keaton, id. at 87-88, for example, this Court was confronted with an overbreadth challenge mounted against another obscenity statute that made it illegal to make a "comment, request, suggestion, or proposal which is obscene, lewd, lascivious, filthy, or indecent" over the telephone. § 365.16(1)(a), Fla. Stat. (1977). The decision in Keaton in turn was based on the earlier case of Spears v. State, 337 So.2d 977 (Fla. 1976), which confronted still another obscenity statute prohibiting public use of "any indecent or obscene language." § 847.05, Fla. Stat. (1975). Also, this Court has addressed a similar obscenity problem in Brown v. State, 358 So.2d 16 (Fla. 1978), which dealt with a statute prohibiting "open profanity." § 847.04, Fla. Stat. (1975).
In Keaton, we began our analysis with the established principle that courts should construe a statute so as to render it constitutional, if at all possible. Keaton, 371 So.2d at 89. But Keaton also noted that this rule is qualified by the condition that courts may not engage in the essentially legislative act of varying actual intent or reading new elements into a statute, id., which would violate the separation of powers doctrine.[20] Art. II, § 3, Fla. Const. Based on these rules, Keaton declined to judicially alter the actual language of the telephone obscenity statute, finding that it was bound by the manifest intent of the statutory wording. As we stated in Brown,
[w]hen the subject statute in no way suggests a saving construction, we will not abandon judicial restraint and effectively rewrite the enactment. The Florida Constitution requires a certain precision defined by the legislature, not legislation articulated by the judiciary.
Brown, 358 So.2d at 20 (citing art. II, § 3, Fla. Const.).
On the question of the overbreadth doctrine itself, Keaton gave an extensive rationale. We noted that the danger of overbroad statutes comes from their tendency to have a chilling effect on activities protected *272 by constitutional law, even if these activities are only before the Court on a hypothetical basis. Keaton, 371 So.2d at 91. On this point, the Court eschewed the possibility of a case-by-case analysis and concluded:
[T]he mere existence of statutes and ordinances purporting to criminalize protected expression operates as a deterrent to the exercise of the rights of free expression, and deters most effectively the prudent, the cautious and the circumspect... .
Keaton, 371 So.2d at 91-92 (quoting Spears, 337 So.2d at 980). Some constitutional rights are so important that even a hypothetical chilling effect must be avoided in the only way possible  by striking the overbroad statute on its face.
Based on this rationale, Keaton then concluded that a statute purporting to criminalize indecent or obscene telephone conversations was unconstitutionally overbroad because it had the effect of outlawing even private, consensual discussions by two adults. The statute, for example, might have the effect of outlawing a hypothetical husband and wife's amorous conversations, or an off-color joke to a willing listener. Id. at 90, 92-93.
This conclusion, in turn, rested on this Court's earlier holding in Spears that a statute forbidding public use of indecent language also was unconstitutionally overbroad. In Spears, we had found that the statute, if read literally, would have criminalized even some hypothetical forms of political speech that happened to employ vulgar or offensive language. Spears, 337 So.2d at 980-81. Accord The Ladoga Canning Corp. v. McKenzie, 370 So.2d 1137 (Fla. 1979).
Similarly, in Brown the Court found that the statute outlawing "open profanity" swept too far into the realm of constitutionally protected speech and could even have the effect of making it unlawful for a hypothetical person to "shout profanities alone in an open field." Brown, 358 So.2d at 20. The Court noted, however, that speech likely to cause harm  such as "fighting words" directed at other persons  could be regulated by the state. Id. at 19-20.
In light of the holdings in Keaton, Spears and Brown, I can only conclude that the obscenity statutes at issue today also are unconstitutionally overbroad, sweeping too far into the realm of privacy and free speech rights protected by Florida law. Art. I, §§ 4, 23, Fla. Const. In effect, the statutes before us restrict the access individuals have to writings, forms of entertainment, or other similar materials.
This result is accomplished in the total absence of evidence, at least upon this record, that these materials have harmed or will harm anyone. The only possible conclusion is that the government in this instance has undertaken to establish minimum standards of taste to which people must conform. The government has assumed authority to determine what is and is not art and to place under governmental regulation the ability of individuals to inquire into matters that may interest them. While not out-of-hand rejecting the right of privacy, this viewpoint nevertheless builds a governmental cordon around the places where such rights may be exercised.
I agree with the Hawaii Supreme Court that privacy is an illusory right if all means of access to it are subject to governmental regulation. The majority in effect says that individuals may be arrested on their doorsteps for possessing reading and entertainment material that would be lawful a few steps away, inside the front door. The absurdity of this situation is plainly revealed by applying the same logic to the possession of contraceptives. The "right" to use contraceptives indeed would be utterly worthless if the government were authorized to arrest persons up until those contraceptives were safely inside the home.
This same conclusion applies no less to the right of personal autonomy, which is an integral aspect of the right to be let alone. If the ability to inquire through reading and entertainment is restricted, so is the right to think freely and to judge for oneself. Individual thought thus becomes subservient to officially sanitized opinions imposed *273 by decree of the state. The right of personal autonomy is impermissibly chilled.
Privacy is not, as the majority erroneously suggests, concerned solely with "objective manifestations" of privacy. Majority op., at 261. If this were true, married couples would have a right only to use those contraceptives they somehow manufactured for themselves behind closed doors. But see Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). If this were true, a woman would never have a right to obtain an abortion anywhere but in her own home; and even then, the government presumably could prohibit medical professionals from entering her home to assist her. But see T.W.
Contrary to the majority's suggestion, privacy is a right that protects both people and the aspects of their lives they have made private. It is a right that people can carry around with them, even when they are in public places and stores. People do not subject themselves to unlimited governmental scrutiny or intrusion into their lives simply because they walk out the front doors of their homes or enter a public place such as a store.
I do not even believe the majority seriously would entertain the notion that government agents can, for example, take embarrassing photographs of law-abiding citizens in a public park and then publish those photographs in a newspaper. The constitutional right to be let alone protects citizens from such official scandalmongering as completely as common law privacy rights protect against similar intrusions by private persons. See Prosser & Keeton, The Law of Torts § 117, at 866 (5th ed. 1984) (lawyers' edition); Barron v. Florida Freedom Newspapers, Inc., 531 So.2d 113, 120 (Fla. 1988) (Barkett, J., specially concurring).
What the majority opinion fails to acknowledge is that, while the right to be let alone does in fact protect seclusion and other objective manifestations of privacy, it also protects other qualities of individual life as well. Among these are the right to be free from unwarranted governmental prying, id., a right to prohibit governmentally sponsored disclosures of some kinds of personal information, Rasmussen, and a right to self-autonomy. T.W. See Hawkins, Florida Constitutional Law: A Ten-Year Retrospective on the State Bill of Rights, 14 Nova L.Rev. 693, 831-55 (1990) (discussing categories of privacy rights).
In order to reach its result, the majority erroneously analyzes this case as though it involved no interest other than "objective manifestations" of privacy such as seclusion. This is only little different from analyzing a free speech claim using nothing but fourth amendment doctrine. It prejudices the case in advance. Thus, while appearing to engage in a proper legal analysis, the majority is doing nothing of the kind. The present case clearly and unmistakably implicates self-autonomy interests that the majority simply ignores. In the process, the majority also ignores ten years of privacy jurisprudence developed by this Court and from which the majority obviously does not intend to recede.
There are other serious flaws in the majority argument. The concluding paragraphs of the majority opinion, for example, argue that Eisenstadt is nothing but an equal protection case, thus suggesting that privacy was not at issue there. Majority op., at 262-263. This is not true. While Eisenstadt certainly dealt with equal protection issues, it also dealt with privacy. Indeed, the holding of Eisenstadt is unintelligible unless it is premised upon a privacy right involved in the purchase and sale of contraceptives.[21] Moreover, the majority *274 completely overlooks the opinion in Griswold, which rests four-square on privacy and is the starting point from which Eisenstadt proceeds. Arguing that Eisenstadt and its predecessor, Griswold, have nothing to do with privacy is a gross misrepresentation of federal law.
The majority also suggests that privacy is a right that may not be raised vicariously. The majority states:
[I]t does not appear that the defense ... presented private individuals whose right to possess obscene materials at home had been violated by the instant action.
Majority op., at 261. Although the majority stops short of actually holding that vicarious standing is not allowed, some persons may be misled by the majority's dictum.
However, such a reading would render the majority opinion self-contradictory. We clearly have allowed vicarious standing without requiring the identification of the particular third parties whose rights are being asserted. State v. Saiez, 489 So.2d 1125 (Fla. 1986); Rasmussen. The majority itself clearly assumes this to be true. In fact, the majority could not reach the merits of this case or approve the opinion under review if it seriously believed defense counsel was required to locate individuals whose right to possess entertainment materials in the home had been chilled in the present case. If such a requirement really existed, the majority would be forced to dismiss this cause for lack of standing. This, they have not done.
Indeed, under our precedents, we clearly are required to consider the chilling effect the obscenity and RICO statutes will have on other individuals as a result of this case, whether or not the defense has identified such persons. Keaton; Spears; Brown. Even a brief consideration of the majority opinion discloses how, in the real world beyond this courtroom, the chilling effect will be very severe indeed. Under the majority opinion, the possession or sale of "offensive" materials is equated with organized crime, drug smuggling, and murder-for-hire operations  all of which also may be racketeering offenses.
And the penalty?  up to life in prison, heavy fines, and the possibility that the government may seek forfeiture of assets or property used to advance this "racketeering" activity. Compare § 895.02(1)(a)28, Fla. Stat. (1989) (making sale or possession of obscene materials a racketeering offense) with § 895.04(1), Fla. Stat. (1989) (making racketeering a first-degree felony) and § 895.05(2), Fla. Stat. (1989) (authorizing forfeitures of property).
Even if we ignore the rights of free speech and privacy, these results are patently absurd and should not be permitted to stand. At a minimum, the draconian penalties endorsed by the majority are unconstitutionally excessive. Art. I, § 17, Fla. Const. They offend basic concepts of due process by establishing penalties out of all proportion to the harm that actually results in most instances from the activities involved. Art. I, § 9, Fla. Const. The state clearly can achieve the result it wishes using less drastic measures.
Moreover, under the majority opinion, the question of what is or is not obscene will be decided entirely by geographical happenstance. Material considered obscene in one part of Florida will merely be lawful entertainment elsewhere. Persons buying or selling such entertainment may be "racketeers" in one place and upstanding citizens in another. And all Floridians are subject to the concern that the compact discs, videos, recordings, or books they have obtained for use or resale might send them to state prison as racketeers.
This is unacceptable in a free society.

VI. Conclusion
For the foregoing reasons, I would hold that both the 1985 and 1986 versions of section 847.011, Florida Statutes, are overbroad *275 and facially unconstitutional because they sweep too far into areas protected by Florida's right to be let alone and the right of free speech. Art. I, §§ 4, 23, Fla. Const. I also would hold that, as applied to materials alleged to be obscene, the RICO statutes are void for imposing an excessive punishment, article I, section 17, Florida Constitution, and for violating due process. Art. I, § 9, Fla. Const. Thus, I would quash the opinion below.
I must emphasize, however, that I would leave intact the state's ability to reach and prohibit the harmful activities of child pornographers, a subject confronted by an entirely separate statute not before us today. See § 827.071, Fla. Stat. (1989). See also Osborne v. Ohio, ___ U.S. ___, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (upholding Ohio child pornography statute). Similarly, we are not asked to consider, and I thus would not address, the validity of other obscenity statutes, such as the one prohibiting the sale of pornography to minors. § 847.013, Fla. Stat. (1989).
I am aware that many people in our society strongly believe that material regarded as "obscenity" is inherently distasteful. With this personal assessment, I wholeheartedly agree. However, in deciding this case, the courts are duty-bound to survey and consider the broader panorama of human rights. While I view the material at issue today as highly objectionable, this judgment itself is not a sufficient reason to permit an unlimited and unrestrained governmental intrusion into fundamental rights.
The same right of privacy that protects the sanctity of the family home also protects personal autonomy and the right of free inquiry. This is the very essence of our democracy. Anglo-American law rests on the principle that rules of law must be neutral. While many of us in our hearts disagree with some of the activities protected by constitutional rights, we nevertheless must recognize that these same rights protect other activities that we ourselves hold dear. An unequal application of law jeopardizes not merely the despised, but also the cherished.
In this case, the application of the law approved by the majority is not merely unequal. It is excessive and out of all proportion to the actual harmfulness of the defendants' activities. It is directly contrary to Florida's privacy amendment and the guarantees of due process and free speech, not to mention common sense.
I respectfully dissent.
BARKETT, J., concurs.
NOTES
[1] The 1985 statute provided, in pertinent part:

(1)(a) A person who knowingly sells ... [or] shows ... any obscene, lewd, lascivious, filthy, indecent, sadistic, or masochistic book, magazine, periodical, pamphlet, newspaper, comic book, story paper, written or printed story or article, writing, paper, card, picture, drawing, photograph, motion-picture film, figure, image, phonograph record, or wire or tape or other recording ... is guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083. .. .
(b) The knowing possession by any person of six or more identical or similar materials, matters, articles, or things coming within the provisions of paragraph (a) is presumptive evidence of the violation of said paragraph.
(2) A person who knowingly has in his possession, custody, or control any obscene [material] ..., without intent to sell, lend, give away, distribute, transmit, show, transmute, or advertise the same, is guilty of a misdemeanor of the second degree... .
§ 847.011, Fla. Stat. (1985).
[2] The 1986 statute provides, in part:

(1)(a) Any person who knowingly sells, ... [or] shows ... any obscene book, magazine, periodical, pamphlet, newspaper, comic book, story paper, written or printed story or article, writing, paper, card, picture, drawing, photograph, motion-picture film, figure, image, phonograph record, or wire or tape or other recording ... is guilty of a misdemeanor of the first degree... .
(b) The knowing possession by any person of three or more identical or similar materials, matters, articles, or things coming within the provisions of paragraph (a) is prima facie evidence of the violation of said paragraph.
(2) A person who knowingly has in his possession, custody, or control any obscene [material] ..., without intent to sell, lend, give away, distribute, transmit, show, transmute, or advertise the same, is guilty of a misdemeanor of the second degree... .
§ 847.011, Fla. Stat. (Supp. 1986).
[3] Art. I, § 23, Fla. Const., provides:

Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law.
[4] To the extent that § 847.011(2), Fla. Stat. (1985 & Supp. 1986), criminalizes mere possession for private, individual use, that subsection is unconstitutional. That claim, however, is not presented in the instant case.
[5] The Court went on to explain:

The sum of experience, including that of the past two decades, affords an ample basis for legislatures to conclude that a sensitive, key relationship of human existence, central to family life, community welfare, and the development of human personality, can be debased and distorted by crass commercial exploitation of sex. Nothing in the Constitution prohibits a State from reaching such a conclusion and acting on it legislatively simply because there is no conclusive evidence or empirical data.
Paris Adult Theatre I v. Slaton, 413 U.S. 49, 63, 93 S.Ct. 2628, 2638, 37 L.Ed.2d 446 (1973).
[6] Except as stated in n. 4, supra.
[7] As a predicate for its ruling the Court quoted from Reed v. Reed, 404 U.S. 71, 75-76, 92 S.Ct. 251, 253-54, 30 L.Ed.2d 225 (1971):

"In applying that clause, this Court has consistently recognized that the Fourteenth Amendment does not deny to States the power to treat different classes of persons in different ways. The Equal Protection Clause of that amendment does, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification `must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)."
Eisenstadt v. Baird, 405 U.S. 438, 446-47, 92 S.Ct. 1029, 1034-35, 31 L.Ed.2d 349 (1972) (citations omitted).
[*] Thus, some "obscenity" is prosecuted and much equally "obscene" material continues to flood the marketplace. In addition to the legal infirmities, one must acknowledge that this approach has never worked. The law's haphazard enforcement has consumed court time (ironically often to a packed house) in the search for "community standards," sometimes resulting in the condemnation of commonly accepted works of art. See infra at 268 (Kogan, J., dissenting). Meanwhile, much truly degrading material continues to proliferate without censure.
[8] This amendment followed a line of earlier case law recognizing a right of privacy in Florida. Satz v. Perlmutter, 362 So.2d 160 (Fla.4th DCA 1978), approved, 379 So.2d 359 (Fla. 1980); Graham v. Florida Legislative Investigation Committee, 126 So.2d 133, 136 (Fla. 1960); Thompson v. City of Jacksonville, 130 So.2d 105, 108 (Fla. 1st DCA 1961), cert. denied, 147 So.2d 530 (Fla. 1962); Griffith v. State, 111 So.2d 282, 289 (Fla. 1st DCA 1959), cert. denied, 114 So.2d 6 (Fla. 1959). See Cason v. Baskin, 155 Fla. 198, 20 So.2d 243 (1944) (recognizing tort of invasion of privacy as an aspect of right of privacy).
[9] However, the federal courts had never addressed the question of whether possession of child pornography in the home was permissible, until the case of Osborne v. Ohio, ___ U.S. ___, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990).
[10] Judge Cope now serves on the Third District Court of Appeal.
[11] The Constitution Revision Commission actually proposed the present language of the privacy amendment in 1978 as part of an omnibus revision of the state Constitution presented to the voters and later defeated. However, the privacy amendment itself was severed from the omnibus package and presented as a separate proposal, winning approval in November 1980. Accordingly, we previously have resorted to the history of the 1977-78 Constitution Revision Commission, which Professor Dore and Judge Cope have extensively analyzed, to determine the intent underlying the privacy amendment. Rasmussen v. South Florida Blood Serv., Inc., 500 So.2d 533, 536 (Fla. 1987) (directly relying on Revision Commission history).
[12] Indeed, the privacy amendment itself explicitly is concerned at least in part with a right to be "free from governmental intrusion into [one's] private life." Art. I, § 23, Fla. Const.
[13] Although the federal courts have never developed a privacy concept as vigorous as that urged by Justice Brandeis, they nevertheless have enthusiastically cited his Olmstead dissent to support a right of privacy in specific contexts. E.g., Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247-48, 22 L.Ed.2d 542 (1969) (right to have obscene materials in the home); Griswold v. Connecticut, 381 U.S. 479, 494, 85 S.Ct. 1678, 1687, 14 L.Ed.2d 510 (1965) (right to obtain contraceptives), limited on other grounds, City of Dallas v. Stanglin, 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989).
[14] Indeed, historians have established that Brandeis heavily relied on his 1890 law review article in developing the public-law concept of privacy contained in this famous dissent. L.J. Paper, Brandeis 311-12 (1983).
[15] See Commonwealth v. Friede, 271 Mass. 318, 171 N.E. 472 (1930).
[16] See People on Complaint of Sumner v. Dial Press, Inc., 182 Misc. 416, 48 N.Y.S.2d 480 (Magis.Ct. 1944).
[17] See Attorney General v. Book Named "God's Little Acre," 326 Mass. 281, 93 N.E.2d 819 (1950).
[18] The state clearly had an opportunity to raise this argument in the trial court. Indeed, in response to the motion to dismiss, the state both mentioned and argued, albeit in a cursory manner, "[t]he harm caused or threatened to the victim or society." The trial court then conducted an extensive hearing, the transcript of which reveals no effort by the trial court to restrict the state's presentation of evidence of harmfulness. In essence, the state asks us to take judicial notice of the harmfulness of obscenity. Yet, if we may take judicial notice of any fact, it is that many experts and reasonable persons within our society have sharply differing views as to the harmfulness of various forms of obscenity or even what exactly constitutes "obscenity." Long ago we held that a matter not authoritatively settled is inappropriate for judicial notice, e.g., Makos v. Prince, 64 So.2d 670 (Fla. 1953), a conclusion fully supported by the present evidence code. See §§ 90.202-.207, Fla. Stat. (1989).
[19] Of course, at a hearing to dismiss an information charging violation of the obscenity laws, the state must have an opportunity to present such evidence to the court.
[20] Indeed, Florida law requires that statutes be precisely drawn so that state officers and agents are not effectively delegated authority to infringe constitutional rights capriciously. Keaton, 371 So.2d at 89; Brown, 358 So.2d at 20 (citing art. II, § 3, Fla. Const.). See State v. Jenkins, 469 So.2d 733, 734 (Fla. 1985); State v. DeLeo, 356 So.2d 306 (Fla. 1978).
[21] Indeed, the majority fails either to acknowledge or explain the following relevant statement from Eisenstadt:

If under Griswold [v. Connecticut, 381 U.S. 479 [85 S.Ct. 1678, 14 L.Ed.2d 510] (1965)] the distribution of contraceptives to married persons cannot be prohibited, a ban on distribution to unmarried persons would be equally impermissible. It is true that in Griswold the right of privacy in question inhered in the marital relationship. Yet the marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup. If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.
Eisenstadt v. Baird, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972) (emphasis in original).