CANTERO, J.,
dissenting.
Today the majority holds that a minor has a right of privacy to remain on public streets literally in the middle of the night. I cannot agree with such an expansive reading of the right to privacy. In my opinion, the ordinances at issue do not even implicate — much less infringe upon— the minors’ constitutional rights to privacy or any purported right to “freedom of movement.” I believe the rational basis standard should apply to review of these ordinances. Even applying the standard most federal circuit courts have employed, however — a heightened review — the ordinances still survive attack, as the Second District Court of Appeal originally held in this case four years ago. Finally, as other courts have found, the ordinances survive even strict scrutiny analysis, as they are narrowly tailored to serve the compelling interest that even the majority concedes exists.
I. Which Standard Applies?
The first issue in every case considering the constitutionality of a statute or ordinance is which standard applies. Not only is the applicable standard the threshold determination in any constitutional analysis; it is often the most crucial. In this case, it has made all the difference. The district court originally reviewed these ordinances under a heightened scrutiny, and upheld them. See State v. T.M., 761 So.2d 1140, 1146, 1150 (Fla. 2d DCA 2000) (T.M.I). On remand from this Court, it applied strict scrutiny, and invalidated them. See J.P. v. State, 832 So.2d 110, 112 (Fla. 2d DCA 2002) (J.P.III). Therefore, we should thoughtfully analyze the applicable standard.
I recognize that when this Court last reviewed this issue in the prior iteration of *1121 this case, T.M. v. State, 784 So.2d 442 (Fla.2001) (T.M.II), the State conceded that strict scrutiny analysis applied because it argued that even under that standard the ordinances at issue were constitutional. Id. at 444; cf. Qutb v. Strauss, 11 F.3d 488, 492 (5th Cir.1993) (assuming, without deciding, that a juvenile curfew ordinance implicated a fundamental right because the ordinance was constitutional even under strict scrutiny analysis). We agreed with the State’s concession and, in a single sentence, adopted it as our holding. See T.M. II, 784 So.2d at 444 (“We agree and hold in answer to the first certified question that strict scrutiny applies when reviewing a juvenile curfew ordinance.”). The majority now concludes that we “held” that strict scrutiny applied, and concludes that to hold otherwise now “would require the Court to recede from its precedent of only three years ago.” Majority op. at 1108. Our opinion in T.M. II contains no analysis of the issue whatsoever, and nothing in the opinion, other than the single cryptic phrase “we agree [with the state’s concession] and hold ...” even hints at analysis. To the extent this bald, unexplained “holding” can be considered precedent, when combined with the fact that the State conceded the issue, I do not believe it is worthy of deference. The standard for reviewing the constitutionality of an ordinance is too important to be based on a concession, followed by “we agree and hold that ...” This is especially true in this case, which is the same case we reviewed then, and where the doctrine of the law of the case, not stare decisis, applies.
The doctrine of the law of the case generally provides that “all questions of law which have been decided by the highest appellate court become the law of the case which ... must be followed in subsequent proceedings.” Brunner Enters., Inc. v. Dep’t of Revenue, 452 So.2d 550, 552 (Fla.1984). Recognizing that correctness is sometimes more important than consistency, however, this Court has carved out an important exception to the doctrine. Under that exception, “[t]his Court has the power to reconsider and correct erroneous rulings in exceptional circumstances and where reliance on the previous decision would result in manifest injustice, notwithstanding that such rulings have become the law of the case.” State v. Owen, 696 So.2d 715, 720 (Fla.1997) (citing Preston v. State, 444 So.2d 939 (Fla.1984)).
This case presents an exceptional circumstance in which automatic reliance on our previous decision would result in “manifest injustice.” In T.M. II, we ordered the district court to apply strict scrutiny without so much as identifying the fundamental right upon which that mandate was based. We offered no analysis to support our holding. Cf. Fla. Dep’t of Transp. v. Juliano, 801 So.2d 101, 108 (Fla.2001) (“[W]here a previous appellate court has given no explanation for its decision, a subsequent appellate court is not bound by the law of the case unless a determination concerning the propriety of the trial court’s order is necessarily inconsistent with every possible correct basis for the earlier rulings.”). It would be manifestly unjust to perpetuate the erroneous application of strict scrutiny to this case purely on the basis of an unexplained, one-sentence holding. See Owen, 696 So.2d at 720 (“[RJeliance upon our prior decision ... would result in manifest injustice to the people of this state because it would perpetuate a rule which we have now determined to be an undue restriction of legitimate law enforcement activity.”); Preston, 444 So.2d at 942 (“The interest of justice [and] substantive due process re *1122 quirements ... support our decision to review this issue [notwithstanding the rule of the case].”).
Even if the doctrine of stare decisis applies, that doctrine does not absolve this Court of its responsibility to explain and justify its constitutional interpretations, especially when those interpretations address the scope of citizens’ fundamental rights. Cf. State v. Menzies, 889 P.2d 393, 399 (Utah 1994) (“[The] stare decisis effect of [the] case is substantially diminished by the fact that the legal point therein was decided without argument.”) (quoting 20 Am.Jur.2d Courts § 193 (1965)). The fact that the majority conducts its own lengthy analysis of the appropriate standard of review only confirms my conclusion that our one-sentence analysis in T.M. II should not resolve — indeed, was never understood by this Court as resolving — this important issue for all future cases.
Courts use three different standards for determining a law’s constitutionality: rational basis review, intermediate (or heightened) scrutiny, and strict scrutiny. These three standards act like lenses of different strength, from simple eyeglasses, to a magnifying glass, to a microscope. At each level, the court more closely examines the government’s purpose in enacting the law and the means used to attain it.
The most common, and least intrusive, standard is the rational basis test. It is used when the law at issue does not involve a suspect classification (such as a racial one) or infringe on a fundamental right. See, e.g., Heller v. Doe, 509 U.S. 312, 319-20, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Under that test, a statute or ordinance must be rationally related to a legitimate governmental interest. Westerheide v. State, 831 So.2d 93, 110 (Fla.2002). Where fundamental rights of minors are involved, courts sometimes invoke “intermediate” or “heightened” scrutiny. See Schleifer v. City of Charlottesville, 159 F.3d 843, 847 (4th Cir.1998). To withstand such heightened review, the ordinance must be substantially related to the achievement of important government interests. See Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Finally, when a statute or ordinance infringes on the fundamental rights of adults, the law must pass the most exacting standard of review, called strict scrutiny. See Reno v. Flores, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). For an ordinance to withstand strict scrutiny, it must be necessary to promote a compelling governmental interest and must be narrowly tailored to advance that interest. See Plyler v. Doe, 457 U.S. at 216-17, 102 S.Ct. 2382.
The majority concludes that strict scrutiny review applies “because fundamental rights are implicated by the juvenile curfew ordinances.” Majority op. at 1109. The majority acknowledges that the ordinances do not implicate the minors’ freedom of speech and of assembly. Majority op. at 1111. Nevertheless, it holds that the ordinances implicate the rights to privacy and freedom of movement. Id. at 1115. I will address these in turn.
A. Minors’ Rights to Privacy
Regarding the minors’ asserted right to privacy, the majority states that “the cities’ asserted compelling interest of preventing victimization of minors could outweigh the minors’ privacy rights during the curfew hours, if the ordinances were narrowly tailored to achieve that goal as required by strict scrutiny.” Majority op. at 1112. But the majority never answers whether the juvenile curfew ordinances implicate the minors’ privacy rights in the *1123 first place. If they do not, then the ordinances need not be considered under a strict scrutiny analysis. I do not see how an ordinance prohibiting minors from remaining in public unsupervised during late night hours violates their right to privacy.
In cases involving fundamental rights, the judicial analysis must begin with a careful description of the asserted fundamental liberty interest. See Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (quoting Moore v. City of East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977)). Before the strict scrutiny standard is applied to right of privacy claims, the court must inquire into whether a reasonable expectation of privacy exists. Winfield v. Div. of Pari-Mutuel Wagering, 477 So.2d 544, 547 (Fla.1985). This analysis inevitably requires an inquiry into the scope and dimensions of the fundamental right at issue and whether the case before us falls within its dimensions. Cf. Hutchins v. Dist. of Columbia, 188 F.3d 531, 537 (D.C.Cir.1999) (inquiring into the scope and dimension of parent’s fundamental right and determining that the right was not implicated). In determining the scope of a fundamental right, we should remember the general principle that “[b]y extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action.” Glucksberg, 521 U.S. at 720, 117 S.Ct. 2258.
With this principle in mind, the issue is not whether minors have a “right to privacy.” The real question is whether the scope of that right includes a right to remain in public unsupervised at any hour of day or night. Only if minors have a fundamental right to such activity may we then ask whether the State has an important (intermediate scrutiny) or compelling (strict scrutiny) interest in curtailing that right, and whether the law is substantially related (intermediate scrutiny) or narrowly tailored (strict scrutiny) toward that interest. The majority never answers this question. It simply assumes that any fundamental right to privacy that minors possess necessarily includes the right to remain unsupervised in public late at night. Because of the many factors that distinguish minors from adults, I do not believe that minors have such a right at all, and much less that any such right is so fundamental that it cannot be circumscribed.
It is well settled that the government has a greater ability to regulate actions of children than those of adults. See Prince v. Massachusetts, 321 U.S. 158, 168, 64 S.Ct. 438, 88 L.Ed. 645 (1944). This difference in how the law treats minors is based on various factors that distinguish minors from adults, including the peculiar vulnerability of children and their inability to make critical decisions in an informed and mature manner. See Bellotti v. Baird, 443 U.S. 622, 635, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (noting that “during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them”) (plurality opinion); cf. Jones v. State, 640 So.2d 1084, 1087 (Fla.1994) (recognizing that the state has a compelling interest in protecting children from sexual activity before their minds and bodies have sufficiently matured to make it appropriate, safe, and healthy for them). Thus, minors’ rights of privacy do not vitiate the legislature’s efforts and authority to protect them from the conduct of others or from their own inability to make wise decisions. Jones, 640 So.2d at 1087.
*1124 The right to privacy also does not necessarily extend to public acts. In Stall v. State, 570 So.2d 257, 260 (Fla.1990), for example, we held that although the right to privacy protected the private enjoyment of obscene material in one’s home, there was no legitimate reasonable expectation of privacy in being able to publicly purchase such material. The Court noted the State’s legitimate interest “in stemming the tide of commercialized obscenity.” Id. at 260 (quoting Paris Adult Theatre I v. Slaton, 413 U.S. 49, 57, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973)). The Court also stated that “we are a society of individuals who make a whole community,” id. at 261 (emphasis added), and that granting the unfettered ability to publicly obtain such material would “affect the world about the rest of us, and ... impinge on other priva-cies,” id. at 261 (quoting Paris Adult Theatre I, 413 U.S. at 59, 93 S.Ct. 2628); see also Prince, 321 U.S. at 166, 168, 64 S.Ct. 438 (distinguishing between the “private realm of family life” and the “evils ... [of] public places”). Stall rejected the petitioners’ argument that a citizen’s private right to possess and enjoy obscene material encompassed the public sale and distribution of such material. Id. Based on the same reasoning, we should reject the argument that the curfew ordinances somehow infringe on a minor’s right to privacy. The ordinances do not in any way limit what minors may do in the privacy of their family homes.
The majority, however, concludes that the Florida Constitution’s privacy provision “affords Florida citizens greater protection in the area of privacy than does the federal Constitution.” Majority op. at 1115. That Florida’s right of privacy may be more expansive than the federal right, however, does not make it all-encompassing. The right to privacy is not a wild card that, when played, suddenly renders any ordinance unconstitutional. We have recognized that article I, section 23 “was not intended to provide an absolute guarantee against all governmental intrusion into the private life of an individual.” Winfield, 477 So.2d at 547 (quoting Fla. Bd. of Bar Exam’rs re Applicant, 443 So.2d 71, 74 (Fla.1983)). As we have noted:
Practically any law interferes in some manner with someone’s right of privacy. The difficulty lies in deciding the proper balance between this right and the legitimate interest of the state. As the representative of the people, the legislature is charged with the responsibility of deciding where to draw the line. Only when that decision clearly transgresses private rights should the courts interfere.
Stall, 570 So.2d at 261 (quoting In re T.W., 551 So.2d 1186, 1204 (Fla.1989) (Grimes, J., concurring in part and dissenting in part)).
The majority essentially holds that minors have a fundamental right to roam in public unsupervised during any time of the day or night. This would protect a minor’s right to be on the street in the middle of the night, regardless of the costs to the community in the form of higher crime rates, law enforcement costs and other negative consequences. Neither the record in this case nor common sense suggests that the purported independence of juveniles to be out in the public during the late night and early morning hours constitutes such a fundamental right. As one court has emphasized, “[fjorbidding preventive measures such as curfews propels localities to the harshest of alternatives— waiting for juveniles actually to commit criminal offenses and then apprehending, *1125 prosecuting, and punishing them.” Schleifer, 159 F.3d at 855. Neither the State nor its citizens — whether children or adults — benefit from relegating the State to such a strictly remedial role.
B. Minors’ Right to Freedom of Movement
The majority also holds that the ordinances implicate the minors’ “constitutional right of freedom of movement.” Majority op. at 1112. I do not find any such right in either the Constitution or the cases interpreting it. It is true that the right to interstate travel is “firmly embedded” in the U.S. Supreme Court’s constitutional jurisprudence. Saenz v. Roe, 526 U.S. 489, 498, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999); see also Shapiro v. Thompson, 394 U.S. 618, 629-31, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). This right has been characterized as emanating both from the Privileges and Immunities Clause of the Fourteenth Amendment, see Saenz, 526 U.S. at 489, 119 S.Ct. 1518 (grounding at least one component of the right on that clause), and on the Commerce Clause, see Edwards v. California, 314 U.S. 160, 173-74, 62 S.Ct. 164, 86 L.Ed. 119 (1941). The cases in which the Supreme Court has explained the right, however, all concerned interstate or international travel. As the majority acknowledges, the Supreme Court has never held that the Constitution grants a fundamental right to a generalized freedom of movement. See Hutchins, 188 F.3d at 535-39.[10] In fact, in Memorial Hospital v. Maricopa County, 415 U.S. 250, 255, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), the Supreme Court specifically declined to decide the issue. Much less has the Court held, or even implied, that such a right would extend to minors.
Apparently recognizing this fact, the majority attempts to find such a right in our decision in Wyche v. State, 619 So.2d 231, 235 (Fla.1993). The majority quotes the following memorable passage from Wyche:
Hailing a cab or a friend, chatting on a public street, and simply strolling aimlessly are time-honored pastimes in our society and are clearly protected under Florida as well as federal law. All Florida citizens enjoy the inherent right to window shop, saunter down a sidewalk, and wave to friends and passersby with no fear of arrest.
619 So.2d at 235 (footnotes and citations omitted). The majority concludes from this passage that “the right to intrastate travel in Florida is clear.” Majority op. at 1113. The clarity of that proposition is, however, a function of its abstractness. Of course all Florida citizens have the “inherent right” to stroll and chat, to saunter and wave, in the absence of justified legislation to the contrary. But how strong is that right? Is it “fundamental”? Do minors have the same right as adults?
Wyche does not answer these questions. If anything, Wyche indicates that the right to intrastate travel in Florida is not a fundamental right, but is instead subject to rational basis review. See Wyche, 619 So.2d at 237 (“[I]t is impossible to say that the ordinance bears a reasonable relation to a permissible legislative objective and is *1126 not discriminatory, arbitrary, or oppressive.”). Also, Wyche indicates that the right to intrastate travel is merely derivative of the two constitutional rights I have already discussed: the Florida right to privacy and the federal right to interstate travel. Id. at 235 n. 5.
Because, as the majority admits, “the United States Supreme Court has never definitively ruled that there is a fundamental right to intrastate travel,” Majority op. at 1113, it seems safe to assume that Wyche¡s oblique reference to an “inherent right” that is “clearly protected under Florida as well as federal law” was not intended to announce a fundamental right to intrastate travel. Wyche itself did not involve travel at all — it concerned an ordinance that prohibited loitering for the purpose of engaging in prostitution. Id. at 233 n. 2.
In sum, the “inherent right” described in Wyche falls in the same category as countless other rights that — while undeniably important — are not “fundamental” in the constitutional sense. See, e.g., San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35-36, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (concluding that childhood education, despite its “undisputed importance,” is not a fundamental right for purposes of the Equal Protection Clause); Mass. Bd. of Retirement v. Murgia, 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (holding that the right to work is not a fundamental right, even though the Court had said in Truax v. Raich, 239 U.S. 33, 41, 36 S.Ct. 7, 60 L.Ed. 131 (1915), that employment is “the very essence of ... personal freedom and opportunity”); Lavine v. Milne, 424 U.S. 577, 584 n. 9, 96 S.Ct. 1010, 47 L.Ed.2d 249 (1976) (holding that welfare support is not a fundamental right, even though the Court had said in Goldberg v. Kelly, 397 U.S. 254, 262 n. 8, 264, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), that welfare payments are “more like ‘property’ than a ‘gratuity’ ” and are the “means to obtain essential food, clothing, housing, and medical care”); Lite v. State, 617 So.2d 1058, 1060 n. 2 (Fla.1993) (holding that the right to drive is not a fundamental right). At any rate, a fundamental right to intrastate travel does not follow inevitably from Wyche as a matter of logic. The majority should at least acknowledge what its decision truly represents: the declaration of a new fundamental right.
Even if a fundamental right to travel or to movement exists, it does not necessarily extend to minors. Again, Wyche did not involve minors, so it had no occasion to determine whether the right involved there applied to them. The Supreme Court has rejected the idea that minors have a right to “come and go at will” because “juveniles, unlike adults, are always in some form of custody.” Reno, 507 U.S. at 302, 113 S.Ct. 1439 (quoting Schall v. Martin, 467 U.S. 253, 265, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984)). “Traditionally at common law ... unemancipated minors lack some of the most fundamental rights of self-determination — including even the right of liberty in its narrow sense, i.e., the right to come and go at will.” Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). I would hold that this case does not implicate any fundamental right of minors to freedom of movement. See Bellotti, 443 U.S. at 634, 99 S.Ct. 3035 (articulating factors justifying treating minors and adults differently); Metropolitan Dade County v. Pred, 665 So.2d 252, 253 (Fla. 3d DCA 1995) (noting that U.S. and Florida Constitutions do not give children “same quantum or quality of rights as adults”). Therefore, the correct standard *1127 for determining the constitutionality of the juvenile ordinances is the rational basis test.
C. Parents’ Right to Raise their Children
The majority declines to rule on the minors’ claims that the ordinances violate their parents’ rights, Majority op. at 1113, but nevertheless spends more than five pages discussing the issue “for the sake of completeness,” Majority op. at 1113, at the end of which the majority “conclude[s] that the ordinances may implicate the parental right to raise children,” but “leave[s] resolution of this issue for another day.” Majority op. at 1115. Therefore, even though, as the majority admits, its discussion of this issue is utter dictum, I respond to it for the sake of the same “completeness.”
Because the majority apparently agrees, Majority op. at 1115 n. 5,1 will not belabor the point that the minors lack standing to raise their parents’ rights. Major implications would follow from a holding that a minor has standing to assert the rights of the parent. In many cases, the parents’ desires to raise their children the way they think best compete with their children’s desires to run their lives the way they think best. Therefore, allowing a minor to assert the parent’s rights encourages the manipulation of arguments to further the minor’s purposes as against the parent’s. As one court has recognized, if we accept the argument that parents’ fundamental rights are implicated in this context, “future litigants could simply artfully plead violations of parental rights to avoid the [well-established] determination that children do not possess all the freedoms of adults. Arguments based on minors’ rights to engage in particular conduct would be routinely recast as arguments based on parents’ rights to allow their children to engage in precisely the same conduct.” Schleifer, 159 F.3d at 852.
Even if the minors had standing to assert this claim, determining “whether an individual has a legitimate expectation of privacy in any given case must be made by considering all the circumstances, especially objective manifestations of that expectation.” Stall, 570 So.2d at 260 (quoting Shaktman v. State, 553 So.2d 148, 153 (Fla.1989) (Ehrlich, J., concurring specially)) (emphasis added). Parents do not have an unlimited constitutional right to rear their children any way they see fit, regardless of the consequences to the community at large. Parents have responsibilities. The State already demands a certain threshold level of care under its child neglect statutes. See, e.g., § 39.001(3), Fla. Stat. (2002) (outlining general protections for children); § 39.01, Fla. Stat. (2002) (defining abuse and abandonment). Parents must ensure that their children are educated, see § 1003.21(l)(a)l, Fla. Stat. (2003) (requiring regular school attendance during the entire school term for children between the ages of six and sixteen); § 1003.24, Fla. Stat. (2003) (providing that, subject to certain exceptions, “each parent of a child within the compulsory attendance age is responsible for the child’s school attendance as required by law”); they cannot abuse or neglect their children, see § 39.806(l)(g), Fla. Stat. (2003) (providing for termination of parental rights when parent abuses child); and they must give their children a certain level of financial support, see § 39.01(30)(f), Fla. Stat. (2003) (stating that the term “neglects the child” encompasses a parent’s failure to “supply the child with adequate food, clothing, shelter, or health care, although financially able to do so or although offered financial or other *1128 means to do so”). An ordinance prohibiting minors from remaining in public unsupervised during late-night hours is simply another legitimate requirement that parents adequately superase their children. Curfew ordinances inevitably assume a threshold level of parental responsibility. See Schleifer, 159 F.3d at 851 (noting that the city was entitled to believe that a nocturnal curfew would promote parental involvement in a child’s upbringing despite evidence that some parents did.not support the curfew); Bykofsky v. Borough of Middletown, 401 F.Supp. 1242, 1255 (M.D.Pa.1975) (noting that curfews encourage parents who ignore their children’s nighttime activities to take a more active role in their children’s lives), aff'd, 535 F.2d 1245 (3d Cir.1976).
As the majority acknowledges, Majority op. at 1114, many courts have held that juvenile curfew ordinances either do not implicate parents’ fundamental rights or interfere with them only minimally. See Hutchins, 188 F.3d at 540-41 (holding that the federal right of parental control only includes parents’ control of the home and formal education of children and not parental decisions about when their children can be on public streets); Schleifer, 159 F.3d at 853 (concluding that a curfew ordinance did not fall within the type of intimate family decisions protected from state interference); Qutb, 11 F.3d at 495-96 (holding that a juvenile curfew ordinance constituted a minimal intrusion on parents’ rights and only affected a parent’s ability to allow the minor to remain in public places, unaccompanied by a parent or guardian); Hodgkins v. Peterson, 175 F.Supp.2d 1132, 1162 (S.D.Ind.2001) (concluding that parents have no fundamental right to allow their minor children to be in public places with parental permission during curfew hours and that statute did not infringe on minors’ First Amendment rights), rev’d, 355 F.3d 1048, 1064-65 (7th Cir.2004) (holding that curfew statute violated minors’ free expression rights but declining to reach the merits of parents’ right to privacy claim); Bykofsky, 401 F.Supp. at 1264 (concluding that the “ordinance constitutes a minimal interference with the parental interest in influencing and controlling the activities of their offspring,” in light of numerous exceptions in the ordinance); City of Panora v. Simmons, 445 N.W.2d 363, 369-70 (Iowa 1989) (holding that a curfew was a minimal infringement on parents’ rights).
I do not contest that parents have a fundamental right in the upbringing of their children. See, e.g., Wisconsin v. Yoder, 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (stating that the “primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition”); Von Eiff v. Azicri, 720 So.2d 510, 513 (Fla.1998) (explaining that Florida’s Constitution guarantees a right to privacy and that such right includes a parent’s fundamental right to rear his or her child). The issue here, however, is the scope and dimension of the right.
The Supreme Court has rejected the view that a parent’s right to raise a child is unqualified, superseding all government regulation. See Prince, 321 U.S. at 167, 64 S.Ct. 438 (stating that “the state has a wide range of power for limiting parental freedom and authority in things affecting the child’s welfare”); Runyon v. McCrary, 427 U.S. 160, 178, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (stating that parents have no constitutional right to provide their children with private school education unfettered by reasonable government regulation); Bykofsky, 401 F.Supp. *1129 at 1262 (stating that the State may act to promote its legitimate interests, despite parents’ fundamental rights, when actions concerning the child have a relation to the public welfare); cf. Cramp v. Bd. of Pub. Instruction of Orange County, 125 So.2d 554, 558 (Fla.) (stating that First Amendment rights are not absolute and that courts must balance the private right against the alleged public interest), rev’d on other grounds, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); 16A Am.Jur.2d Constitutional Law § 397 (1998) (stating generally that fundamental constitutional rights of individuals are not absolute, limitless, or unrestricted rights).
In the parental context, “[n]ot every state restriction of a child’s freedom derivatively abridges the fundamental rights of parents.” Schleifer, 159 F.3d at 852. Parents’ fundamental right to privacy does not encompass allowing their children to wander the public streets unsupervised during the late night hours, even with parental permission. The social burdens that accommodating such a decision would entail, and the risks to the health and safety of children, justify government regulation of that decision. See Yoder, 406 U.S. at 233-34, 92 S.Ct. 1526 (stating that parents’ fundamental rights are “subject to limitation ... if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens”) (emphasis added); cf. People v. Pierson, 176 N.Y. 201, 68 N.E. 243 (1903) (holding that parent’s right to practice religion did not include liberty to expose the community to communicable disease). As one court has said,
insofar as a parent can be thought to have a fundamental right, as against the state, in the upbringing of his or her children, that right is focused on the parents’ control of the home and the parents’ interest in controlling, if he or she wishes, the formal education of children. It does not extend to a parent’s right to unilaterally determine when and if children will be on the streets — certainly at night. That is not among the “intimate family decisions” encompassed by such a right.
Hutchins, 188 F.3d at 540-41 (plurality opinion) (citing Schleifer, 159 F.3d at 853). This is true even in Florida.
II. Application of the Different Standards
As I have noted, because I believe that the ordinances do not implicate fundamental rights, the correct standard is the rational basis test. Most federal circuit courts and state supreme courts considering this particular issue have held that the proper analysis is either rational basis review or intermediate scrutiny. See, e.g., Ramos v. Town of Vernon, 353 F.3d 171, 180-81 (2d Cir.2003); Hutchins, 188 F.3d at 541; Schleifer, 159 F.3d at 847; Sale ex rel. Sale v. Goldman, 208 W.Va. 186, 539 S.E.2d 446, 455 (2000); People in re J.M., 768 P.2d 219, 223 (Colo.1989); City of Panora, 445 N.W.2d at 369. Therefore, the majority’s holding that strict scrutiny applies places this Court in the minority on this issue. See, e.g., Treacy v. Municipality of Anchorage, 91 P.3d 252, 265 n. 60 (Alaska 2004) (applying strict scrutiny but acknowledging that precedents in other jurisdictions point toward intermediate scrutiny).
In my opinion, under any standard, the ordinances survive. Below I apply (A) rational basis review; (B) intermediate scrutiny; and finally (C) strict scrutiny.
A. Rational Basis Review
Under the rational basis test, review is limited to determining whether the ordi *1130 nance in question is rationally related to legitimate governmental interests. Heller v. Doe, 509 U.S. at 319-20, 113 S.Ct. 2637. Laws that involve neither a suspect classification nor fundamental rights are accorded a strong presumption of validity. Id. at 319, 113 S.Ct. 2637.
In Bellotti, the Supreme Court noted three established state concerns in protecting the well-being of minors: the special vulnerability of children, their relative lack of ability to make critical decisions in an informed and mature manner, and the importance of parental authority in bringing-up children. 443 U.S. at 634, 99 S.Ct. 3035.
The majority outlines the purposes of both the Tampa and Pinellas Park ordinances, as expressed in the ordinances themselves. Majority op. at 1116. I will not repeat them here. The majority acknowledges that both cities have established even compelling interests. Majority op. at 1117. For the same reasons, therefore, the government interests are “legitimate” under the rational basis standard.
The only remaining question is whether the ordinances are rationally related to those legitimate government interests. See Lane v. Chiles, 698 So.2d 260, 262 (Fla.1997) (“Generally, a state statute must be upheld ... if there is any reasonable relationship between the act and the furtherance of a valid governmental objective”). At this level of review, scrutiny is deferential to the legislative decision. Courts applying rational basis review also apply the rule of statutory construction that accords legislation a presumption of validity. See Heller v. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); Caple v. Tuttle’s Design-Build, Inc., 753 So.2d 49, 51 (Fla.2000). The rational basis test protects from court interference legislative action on most public policy decisions. The inquiry “employs a relatively relaxed standard reflecting the Court’s awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one.” Murgia, 427 U.S. at 314, 96 S.Ct. 2562.
The Tampa and Pinellas Park ordinances seek to further the following interests: (1) the protection of juveniles, other citizens, and visitors from late night and early morning criminal activity; (2) the reduction of juvenile criminal activity; and (3) the enhancement and enforcement of parental control over children. See Pinel-las Park, Fla., Code § 16-124(B)(2) (1997); Tampa, Fla., Code § 14-26(a)(6) (1996).
Even without statistical data, it is apparent that the ordinances prevent some juvenile crime arising from group or gang activity, because groups of juveniles are easily detected and can be dispersed under the curfews. See Bykofsky, 401 F.Supp. at 1256. The curfews promote the public safety and the safety of juveniles by preventing the late-night accumulation of juveniles on public streets, thereby reducing the attendant risk of criminal activity.
The curfews also encourage parents to supervise and know the whereabouts of their children during nighttime hours. The assumption that the likelihood of criminal activity decreases as the amount of parental control over children increases is not unreasonable. Id.; Pinellas Park, Fla., Code § 16-124(B)(l)(h) (1997) (“The likelihood of criminal activity by juveniles decreases as parental control increases. Legislative incentives to shift supervision of juveniles from government to parents ... creates a more wholesome community environment for juveniles, parents, and families.”). To the extent the curfews in *1131 duce “parents, under the pain of imposition of a criminal penalty, to exercise their control where they otherwise might allow their children free rein and ignore their nighttime whereabouts and activities, [they are] effective in decreasing nocturnal juvenile crime and mischief and in strengthening the family unit.” Bykofsky, 401 F.Supp. at 1256.
For these reasons, the ordinances further the purposes expressed by Tampa and Pinellas Park. Id.; see also City of Panora, 445 N.W.2d at 369 (employing rational basis test and concluding that minors’ interests in intracity movement were outweighed by city’s interest in providing a prophylactic solution to the perceived problems inherent in unrestricted travel by minors); City of Milwaukee v. K.F., 145 Wis.2d 24, 426 N.W.2d 329, 340 (1988) (relying on Bykofsky’s rational basis analysis).
B. Intermediate Scrutiny
Even if, as the majority holds, the ordinances implicate the fundamental rights of minors, they should be subjected only to intermediate scrutiny. This standard asks whether the ordinance is substantially related to important governmental interests. See, e.g., United States v. Virginia, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996).
Intermediate scrutiny is the appropriate level of review, even if the ordinances implicate a fundamental right, because the ordinances govern the conduct of minors. As the Supreme Court has emphasized, the rights of children are not co-extensive with those of adults. See, e.g., Bethel Sell. Dist. No. 403 v. Fraser, 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986); Prince, 321 U.S. at 169, 64 S.Ct. 438. Therefore, “although children generally are protected by the same constitutional guarantees ... as are adults, the State is entitled to adjust its legal system to account for children’s vulnerability” by exercising broader authority over their activities. Bellotti, 443 U.S. at 635, 99 S.Ct. 3035. For that reason, a lesser degree of scrutiny is appropriate when evaluating restrictions on the activities of minors. See Carey v. Population Servs. Int’l, 431 U.S. 678, 693 n. 15, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (plurality opinion).
Florida laws, like those of other states, regularly prohibit minors from engaging in the same activities as adults. See, e.g., § 322.05(1), Fla. Stat. (2003) (prohibiting minors under 15 from driving, and 15-year-olds from driving unaccompanied by an adult); § 562.111(1), Fla. Stat. (2003) (prohibiting persons under 21 from possessing alcoholic beverages); § 569.11(1), Fla. Stat. (2003) (prohibiting persons under 18 from possessing any tobacco product); § 790.01, Fla. Stat. (2003) (prohibiting those under 21 years old from obtaining a license to carry concealed weapons); § 450.081, Fla. Stat. (2003) (limiting the number of hours that minors can work). The Supreme Court has upheld laws imposing limitations on minors that could not be imposed on adults. See, e.g., Prince, 321 U.S. at 169-70, 64 S.Ct. 438 (upholding law prohibiting children from selling magazines on the street, even when accompanied by a parent or guardian, against a claim that the law violated the child’s freedom of religion); Ginsberg v. New York, 390 U.S. 629, 637-43, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (upholding a ban on the sale of material to minors that would not be considered “obscene” for adults).
Based on the state’s greater authority to regulate the actions of minors than those *1132 of adults, in considering juvenile curfew ordinances many courts have employed an intermediate level of scrutiny. See Hutchins, 188 F.3d at 541 (employing intermediate scrutiny); Schleifer, 159 F.3d at 847 (employing intermediate scrutiny, but noting that the ordinance would also survive strict scrutiny); see also Ramos, 353 F.3d at 193 (arguing for rational basis review, but noting that the juvenile curfew ordinance survives even under heightened scrutiny) (Winter, J., dissenting). In fact, when the district court first reviewed these cases, it employed the heightened scrutiny test. See J.P. v. State, 775 So.2d 324, 325 (Fla. 2d DCA 2000) (J.P.I); T.M. I, 761 So.2d at 1146. Under that test, it found both ordinances constitutional.
As I noted above, because the majority acknowledges that the cities have established compelling interests, Majority op. at 1117, which is a higher standard than either “legitimate” (rational basis review) or “important” (intermediate scrutiny) interests, the cities necessarily have established that their government interests are “important” under the intermediate scrutiny standard. The only remaining question is whether the ordinances are substantially related to those important government interests. I would hold that they are.
In addressing the closeness of the relationship between the means chosen (the curfew) and the government’s interest, three interrelated concepts must be considered: (1) the factual premises that prompted the legislative enactment; (2) the logical connection between the remedy and those factual premises; and (3) the breadth of the remedy chosen. Ramos, 353 F.3d at 184 (citing Hutchins, 188 F.3d at 542).[11] This inquiry seeks to ensure that the municipality has studied the contours of the problem it seeks to address and legislates according to its findings. See Buzzetti v. City of New York, 140 F.3d 134, 142 (2d Cir.1998) (making a similar observation in the context of an equal protection claim). However, this standard of review has never required statistical certainty about the legislature’s wisdom in choosing a particular course of action. See Schleifer, 159 F.3d at 849. “It is unrealistic to expect either members of the judiciary or state officials to be well versed in the rigors of experimental or statistical technique.” Craig, 429 U.S. at 204, 97 S.Ct. 451. “[The] uncertain nature of remedial legislation is no reason for courts to fashion their own cures or scuttle those the legislature has provided.” Schleifer, 159 F.3d at 849.
With these general principles in mind, I discuss the ordinances at issue. In the case of the Pinellas Park ordinance, the city evaluated the curfew six months after its passage.[12] The study highlights Pinel-las Park’s juvenile crime problem before the curfew and demonstrates that juvenile crime was an issue during late night hours, particularly in the areas of burglary, trespass, and loitering. Therefore, Pinellas Park had adequate “factual premises” for its decision. See Hutchins, 188 F.3d at 544 (stating that the city did not need to produce data showing where juvenile crime occurred and that the city’s data showing a *1133 substantial percentage of violent juvenile victimizations on the streets adequately supported a relationship between government’s interest and imposition of a curfew). In addition, because the data indicates a late night juvenile crime problem, it follows that a curfew ordinance would constitute a remedy with a “logical connection” to these factual premises. A restriction on unsupervised juveniles’ ability to wander the public streets during late night hours logically relates to curbing juvenile crime and preventing the victimization of minors.
Finally, the curfew’s breadth is best measured against the scope of its exceptions. Here, the Pinellas Park ordinance contains a laundry list of exceptions for First Amendment, employment, civic, and religious activities. Thus, the data indicates that a curfew would further the city’s interest in protecting juveniles and other citizens from late night criminal activity as well as its interest in reducing juvenile crime. See Schleifer, 159 F.3d at 849 (stating that the city’s reliance on data such as police department records, public opinion surveys, and national crime reports entitled the legislature to speculate and conclude that keeping juveniles off the streets during late night hours would make the community safer). Thus, I would hold that the Pinellas Park ordinance passes intermediate scrutiny.
The Tampa curfew, like the Pinellas Park ordinance, contains many exceptions that narrow its scope, thereby strengthening the relationship between the curfew and its goals of reducing juvenile crime and victimization. See Hutchins, 188 F.3d at 544-45. In other words, the exceptions help ensure that the ordinances do not sweep too broadly but instead focus on those late night activities most likely to result in crime and victimization. Id.
Statistical data is not necessary to uphold the curfew ordinances under intermediate scrutiny. Common sense and practical experience are enough. See Delmonico v. State, 155 So.2d 368, 370 (Fla.1963) (applying strict scrutiny to substantive due process claim and emphasizing that the legislature’s action must be measured against practical experience in order “to determine whether [the means chosen] is in fact essential or reasonably necessary in order to achieve the statutory objective”); cf. Hutchins, 188 F.3d at 543 (stating that city was not required to prove a precise fit between the nature of the problem and the legislative remedy and noting that even if data indicated that minors under seventeen were less likely to commit crimes, common sense dictated that younger children were more vulnerable). An examination of the curfew ordinances’ stated goals, common sense, and the curfews’ exceptions demonstrates that the curfews are substantially related to the cities’ stated interests.
C. Strict Scrutiny
This, the strictest standard, is the one the majority employs based on the “we agree and hold” language of T.M. II. Under this standard, the ordinance must promote a compelling (rather than a “legitimate” or “important”) governmental interest and must be narrowly tailored to advance that interest. See, e.g., Plyler v. Doe, 457 U.S. 202, 216-17, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). “To be narrowly tailored, there must be a nexus between the stated government interest and the classification created by the ordinance.” Qutb, 11 F.3d at 493. Such an analysis, however, should not be “strict in theory, but fatal in fact.” See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 237, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). In *1134 other words, application of strict scrutiny review does not automatically render a law unconstitutional. In fact, some courts have upheld juvenile curfew ordinances even under this standard. See Qutb, 11 F.3d at 492 (assuming, without deciding, that a juvenile curfew ordinance implicated a fundamental right because the ordinance was constitutional even under strict scrutiny analysis); Treacy, 91 P.3d at 266 (concluding that “taken as a whole, the ordinance is the least restrictive means available to achieve the municipality’s [compelling] interests”); see also Schleifer, 159 F.3d at 847 (noting that the ordinance would survive strict scrutiny analysis). Others have not. See, e.g., Nunez v. City of San Diego, 114 F.3d 935 (9th Cir.1997). In at least some of the cases invalidating curfew ordinances, however, the ordinances contained fewer exceptions than the ones in this case. See Nunez, 114 F.3d at 938-39 (invalidating an ordinance that did not provide for First Amendment exception); Johnson v. City of Opelousas, 658 F.2d 1065, 1067 (5th Cir.1981) (invalidating an ordinance that did not provide for First Amendment or job-related exceptions).[13]
Again, the majority acknowledges that the ordinances express valid and compelling governmental interests, Majority op. at 1115-17, such as: (1) the protection of juveniles, other citizens, and visitors from late night and early morning criminal activity; (2) the reduction of juvenile criminal activity; and (3) the enhancement and enforcement of parental control over children. See Pinellas Park, Fla., Code § 16-124(B)(2) (1997); Tampa, Fla., Code § 14-26(a)(6) (1996).
The remaining question under this test is whether the ordinance is narrowly tailored to advance that interest. In this regard, the curfew is in effect on weekdays from 11:00 p.m. to 6:00 a.m., and on Friday and Saturday nights from midnight to 6:00 a.m. Therefore, the period of the curfew itself is narrow. It covers, at most, seven hours of the day, during the precise time most school-age children will be sleeping.
Moreover, because the ordinances contain a laundry list of exceptions, the curfew’s scope is even more narrow. The two curfew ordinances are almost identical.[14] Both allow minors to remain in public even during curfew hours if: (1) they are accompanied by a parent or other responsible adult; (2) they are commuting to or from lawful employment; (3) they are engaged in interstate travel (Pinellas Park also includes intrastate travel with the con *1135 sent of the juvenile’s parent); (4) they are engaged in an activity exercising their First Amendment rights such as religious services, government meetings, and political meetings; (5) they are attending or returning from a school-sponsored function, religious function, or a civic organization function; (6) they are on the sidewalk of their own home or an adult next-door neighbor’s residence with that neighbor’s permission; (7) they are at an event, not provided for in the enumerated exceptions, which the city council has approved pursuant to application by a sponsor; or (8) they are married in accordance with law.
Despite the many exceptions in the ordinances, the majority finds them not narrowly tailored enough. Majority op. at 1118. The majority finds two faults with the ordinances: (1) the broad coverage of both curfews includes otherwise innocent and legal conduct by minors even where they have the permission of their parents; and (2) the ordinances impose criminal penalties for curfew violations. Id. As the majority does, I discuss each of these in turn.
A. The Scope of the Ordinances
The majority finds that the curfews proscribe otherwise innocent and legal conduct by minors even with parental permission. Majority op. at 1118. As noted above, however, the ordinances contain a laundry list of exceptions. Through these exceptions, parents retain ample authority to exercise parental control, and minors retain the ability to engage in a broad range of conduct. As with the ordinance at issue in Hutchins, the broad language of the ordinances’ exceptions contemplates flexibility in the administration of the curfews that enhances parental control. See Hutchins, 188 F.3d at 546.[15] The exceptions allow parents significant discretion over their children’s activities during curfew hours. For example, the ordinances impose no restrictions whatsoever when the minor is accompanied by a parent or guardian. Most importantly, the ordinances protect juveniles’ ability to engage in First Amendment conduct. The ordinances also protect juveniles’ ability to work and attend academic, religious, and civic functions. They also allow minors to go to a neighbor’s property and to engage in interstate travel. Under the Tampa ordinances, juveniles are allowed to run errands with parental permission and the Pinellas Park ordinance provides a similar exception for emergency errands. In short, the ordinances limit minors to the extent that they lack a specific and legitimate purpose for being on the streets in the middle of the night.
Despite the breadth of the exceptions, the majority specifically attacks the Pinel-las Park ordinance on two grounds: (1) its failure to provide for nonemergency errands during restricted hours, and (2) its inclusion of seventeen-year-olds within the ordinance’s scheme. Neither of these grounds is persuasive.
The provision for strictly emergency errands simply means that nonemergency errands will have to be accomplished dur *1136 ing the seventeen-hour time period between 6:00 a.m. and 11:00 p.m.
More troubling is the majority’s disapproval of the ordinance’s inclusion of seventeen-year-olds within the curfew. Majority op. at 1118. This distinction is eminently logical. Under state law, a seventeen-year-old is still considered a minor. See § 1.01(13), Fla. Stat. (2003) (defining “minor” for purposes of statutory construction as any person who has not attained the age of eighteen). The majority’s conclusion that seventeen-year-olds cannot be included within the definition of a “minor” for purposes of a juvenile curfew does not bode well for a myriad of laws prohibiting seventeen-year-olds from engaging in various forms of adult conduct. Under the majority’s reasoning, seventeen-year-olds must be allowed to drink alcoholic beverages, to execute contracts, and to work full-time. The majority cites no studies, statistical data, or other evidence demonstrating why seventeen-year-olds should not be considered minors. It also does not explain why the cut-off must be at the age of seventeen, and not at sixteen or fifteen.
Ultimately, determining which ages of minors to include within a curfew is quintessentially a legislative judgment. Cf. Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (noting that the Equal Protection Clause permits states to draw lines on the basis of age at a class-based level, even if it is probably not true that those reasons are valid in the majority of cases); Harper v. Harper, 848 So.2d 1179, 1180 (Fla. 2d DCA 2003) (stating that “[b]y legislative design, children up to the age of eighteen are dependent upon their parents”). “It is not the function of a court ‘to hypothesize independently on the desirability or feasibility of any possible alternative^]’ to the statutory scheme.... ‘These matters of practical judgment and empirical calculation are for [the State].’ ” Lalli v. Lalli, 439 U.S. 259, 274, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978) (alterations in original) (quoting Mathews v. Lucas, 427 U.S. 495, 515, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976)).
Finally, in attacking the alleged “broad coverage” of the ordinances, the majority argues that “the curfews apply throughout the cities without any showing of a citywide need or problem.” Majority op. at 1118. However, a city-wide curfew is a matter of common sense. First, almost insurmountable problems would exist in enforcing a non-citywide curfew. It would expose municipalities to charges of bias or racial profiling. See Hutchins, 188 F.3d at 544 (rejecting on this basis the appellee’s argument that the District was obliged to confine the curfew to high crime areas of the city). Moreover, from a practical perspective, it is doubtful that a non-citywide curfew could adequately achieve its purpose. Juveniles could easily avoid a non-citywide curfew by going from curfew areas, where presumably a juvenile crime problem previously existed, to non-curfew areas, thus creating a juvenile crime problem there. In short, the source of the problems embodied by juvenile crime is not grounded strictly in geography. Again, these are ultimately legislative judgments that courts are ill-equipped to second-guess.
B. The Relevance and Severability of Criminal Penalties
The majority also cites the ordinances’ imposition of criminal penalties as a reason for finding that they are not narrowly drawn. Majority op. at 1119 (“[T]he imposition of criminal sanctions is not narrowly *1137 tailored to achieve the stated interests [of the curfew ordinance].”). This, according to the majority, is “possibly the most troubling aspect of our strict scrutiny review.” Majority op. at 1118.
The majority concludes that the “criminal penalties indicate that the Tampa ordinance does not use the least intrusive means ... especially when viewed against the model ordinance which accomplishes the same goal with only a civil penalty.” Majority op. at 1119. The argument appears to be that the ordinance could be enforced through a civil fine and that the civil penalty can accomplish the necessary deterrent function. However, we have emphasized that arguments about a statute’s deterrent function are “not legal arguments but rather political debate” and that “it is not the place of this or any other court to ... question the political, sociological, or economic wisdom of [an] enactment.” Johnson v. State, 660 So.2d 637, 646 (Fla.1995) (using this language in context of defendant’s argument that death penalty does not operate well as a deterrent). This is consistent with the legislature’s general power to determine the punishments for offenses. See Solem v. Helm, 463 U.S. 277, 290, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) (holding that reviewing courts “should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes”); State v. Coban, 520 So.2d 40, 41 (Fla.1988) (stating that in Florida, the plenary power to prescribe the punishment for criminal offenses lies with the Legislature, not the courts); State v. Keirn, 720 So.2d 1085, 1086 (Fla. 4th DCA 1998) (the Legislature has the sole authority and responsibility to make the criminal laws, including classifying transgressions of the criminal law as either a felony or a misdemeanor). Therefore, that the ordinances impose criminal penalties is irrelevant.
The majority observes that “most of the ordinances that have been upheld as constitutional only impose civil fines or community service requirements.” Majority op. at 1119. The cases cited, however, do not indicate that the absence of criminal penalties was dispositive or that it even factored into the analyses. See, e.g., Hutchins, 188 F.3d at 535 (mentioning the civil penalties and community service requirements of ordinance but not analyzing whether criminal penalties would have affected the constitutional analysis); Qutb, 11. F.3d at 488 (same). Moreover, in Schleifer, 159 F.3d at 858, the court upheld the constitutionality of a juvenile curfew ordinance even though the ordinance punished a violation as a misdemeanor.
Even if the criminal penalties rendered the ordinances unconstitutional, they could be severed. The district court did not analyze severability because it concluded that the statute would be unconstitutional anyway. J.P. III, 832 So.2d at 114. The majority takes a similar approach, concluding that “the ordinances suffer from other constitutional failings which render them invalid.” Majority op. at 1119. While I also believe that severability is irrelevant — in my case, because the criminal penalties do not render the ordinances unconstitutional — I nevertheless discuss it because the majority considers the criminal penalties “the most troubling aspect” of the ordinances. Majority op. at 1118.
Severability depends on the following test:
When a part of a statute is declared unconstitutional the remainder of the act will be permitted to stand provided: (1) the unconstitutional provisions can be *1138 separated from the remaining valid provision, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken.
Waldrup v. Dugger, 562 So.2d 687, 693 (Fla.1990) (quoting Cramp v. Bd. of Pub. Instr., 137 So.2d at 830).
Nothing indicates that the criminal penalties, which do not bear on the law’s substantive content, cannot be separated from the remaining provisions. In both ordinances the central legislative purpose was the protection of juveniles and the reduction of juvenile crime. The criminal penalties are far from the centerpiece of the ordinances. See Martinez v. Scanlan, 582 So.2d 1167, 1173 (Fla.1991) (stressing the need, in determining severability, to analyze the provision in relation to the statute’s overall legislative intent). Here, the legislative purpose expressed in the ordinances can be accomplished independently from the criminal penalty provision. The criminal penalty provision does not appear to be so inseparable in substance that we can say the legislature would not have passed the remainder of the statute. Finally, on its face, severing the criminal penalty provision leaves the remainder of each ordinance intact. Cf. High Ridge Mgmt. Corp. v. State, 354 So.2d 377, 381 (Fla.1977) (holding that deletion of two subsections regarding rating of nursing homes did not disturb the valid portions of the act and left intact a workable statute where the valid provisions standing alone were complete in themselves).
III. Conclusion
For the reasons stated, I would hold that the Tampa and Pinellas Park curfew ordinances are constitutional. Juveniles do not have a fundamental right to be out in public places during the late night hours without adult supervision. Even if they did, the state may limit a minor’s fundamental rights to a greater extent than an adult’s. Finally, even if the ordinances infringe on fundamental rights, they promote a compelling governmental interest and are narrowly tailored to achieve them purposes.
For all these reasons, I respectfully dissent.
WELLS and BELL, JJ., concur.

. In asserting that the "freedom of movement [has] been recognized as [a] basic right[] under the federal Constitution,” Majority op. at 1112, the majority relies on Papa-christou v. City of Jacksonville, 405 U.S. 156, 164, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). That case involved a vagrancy ordinance struck down on vagueness grounds. The flaw in such ordinances is that they fail to give fair notice of the forbidden conduct, not that they infringe on a fundamental right to free movement.

. While Ramos and Hutchins cite these factors in the context of intermediate scrutiny, they also apply when considering whether ordinances are "narrowly tailored” under a strict scrutiny analysis.

. The study looked at the curfew’s first six months of existence and compared it to the same six-month period in 1996. The relevant periods were June 7 to November 30, 1996, and June 7 to November 30, 1997.

. But see Hodgkins v. Peterson, 355 F.3d 1048, 1064 (7th Cir.2004) (holding that a curfew ordinance with substantially the same exceptions as the Tampa and Pinellas Park ordinances was unconstitutional on First Amendment grounds even though it provided affirmative defenses for First Amendment activity); Ramos, 353 F.3d at 172 (invalidating a statute with substantially the same exceptions as those in the Tampa and Pinellas Park ordinances); City of Sumner v. Walsh, 148 Wash.2d 490, 61 P.3d 1111, 1116 (2003) (invalidating a statute that defined "remain1' in a fashion similar to the Tampa ordinance on grounds that defining "remain” as "linger or stay” was unconstitutionally vague).

. The Tampa ordinance is different from the Pinellas Park ordinance in the following respects: (1) it does not apply to seventeen-year-olds; (2) it provides an exception for nonemergency errands with the written approval of a parent; (3) it provides an exception for homeless juveniles who use a public place as their usual abode; (4) it imposes criminal liability on business owners or operators who knowingly permit a juvenile to remain on business premises during curfew hours; and (5) it authorizes a fine of up to $1000 and up to six months' incarceration for a second or subsequent violation.

. In fact, both the Pinellas Park and Tampa ordinances specifically mention parental control in the findings, purposes, and intent sections. See Pinellas Park, Fla., Code § 16-124(B)(1)(h) ("The likelihood of criminal activity by juveniles decreases as parental control increases. Legislative incentives to shift supervision of juveniles from government to parents ... creates a more wholesome community environment for juveniles, parents, and families.”); Tampa, Fla., Code § 14-26(a)(6) (stating that one of ordinance’s purposes is "to promote and enhance parental control over juveniles”).